## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

WORCESTER, SS                                    DOCKET NO.:

VICTOR THIFFAULT,                          )
    **Plaintiff**                              )
                                              )
    **Vs.**                                   )
EASY MANUFACTURING COMPANY     )
SUBURBANITE HOME OF BUTLER     )
HOME PRODUCTS, INC. and        )
SUN LIFE ASSURANCE COMPANY OF CANADA,  )
    **Defendants**                            )

# 05 - 40011FDS

### I.  Introductory Statement

1.  This is an action for long term disability insurance benefits and other equitable relief.

Plaintiff claims "relate to" an "employee welfare benefit plan" as defined by ERISA, 29

U.S.C. §1001 et seq and that the subject plan constitutes a "plan under ERISA".

### II.  Parties

2.  Plaintiff, Victor Thiffault is a citizen of the United States and a resident of Hopedale,

Massachusetts.  He resides at 194 South Main Street, Hopedale, Massachusetts.

3.  Plaintiff alleges that Defendant, Easy Day Manufacturing Company Suburbanite

Home of Butler Home Products, Inc. Group Term Insurance Policy ("the Benefit Plan" is,

and at all relevant times was, an insurance plan organized and existing under the laws

of Massachusetts and authorized to transact the business of insurance in

Massachusetts.  Butler Home Products, Inc. ("Butler Home Products") is a

Massachusetts Corporation with a usual place of business located at 311 Hopping Brook

Road, Holliston, Massachusetts.

RECEIPT # 404496
AMOUNT $ 150.00
SUMMONS ISSUED ✓
LOCAL RULE 4.1 ✓
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 1/20/05

4. Plaintiff alleges that Defendant, Sun Life Assurance Company of Canada ("Sun Life") is, and at all relevant times was, a corporation duly organized and existing under the laws of Massachusetts with a usual place of business in Wellesley, Massachusetts, is authorized to transact and is transacting the business of insurance in Massachusetts, and is the Claims Administrator of Easy Day Manufacturing Company Group Term Insurance Plan.

### III. Jurisdiction

5. This action arises out of Sections 502 and 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132  and 1140 (1974).  This action presents a federal question and this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### IV. Claim for Relief

6. Plaintiff incorporates herein by referenced Paragraphs 1 through 5.

7. Plaintiff was a participant in the Benefit Plan.  A copy of the Benefit Plan is attached as **Exhibit 1** and incorporated herein by reference.

8. Plaintiff began working for Defendant, Butler Home Products, in 1985, until his medical disability on May 18, 1998.  Plaintiff's position was the Director of Distribution Facilities.

9. Plaintiff applied for short term disability benefits from the Benefit Plan and received these benefits through the Plan Administrator, Sun Life.

10. Plaintiff applied for long term disability benefits and presented numerous medical records and reports from his heating physicians to support his long term disability and on or about April 15, 2002, Sun Life sent him notice of a denial of Long Term Disability benefits.  See **Exhibit 2**.

11. Plaintiff's medical evidence is that he suffers from a myriad of medical problems which preclude him from being able to function in any employment. The medical conditions include but are not limited to Polymyalgia Rheumatica; Neurological Dysfunction; Osteopenia; Attention Deficit Disorder, (inattentive type); and Sleep Apnea.

12. Plaintiff filed a request for appeal and Sun Life denied his appeal. The Plaintiff has exhausted all rights of appeal through SunLife, as identified in letter dated February 5, 2003. See **Exhibit 3**.

13. Plaintiff's denial of his Long Term Disability benefits was an arbitrary and capricious decision given the medical documentation presented by the Plaintiff and this denial has interfered with his protected rights to receive benefits under the Benefits Plan in violation of 29 U.S.C. § 1140.

    WHEREFORE, Plaintiff requests the following relief:

A.  An order awarding Plaintiff the long term disability benefits to which he is entitled under the Benefits Plan;

B.  A declaratory judgment that the practices complained of are unlawful and void;

C.  An award of pre-judgment and post-judgment interest on all amounts awarded pursuant to Plaintiff's claims;

D.  An award of attorneys' fees and all costs pursuant to 29 U.S.C. § 1132(g)(l);

E.  An order requesting the immediate payment of Plaintiff's Long Term Disability benefits from the date of the denial to date;

F.  An award of all compensatory damages incurred by Plaintiff;

G.  An award of punitive damages; and,

H.  For such further relief as the Court deems just and proper.

<div style="margin-left: 40%;">

Victor Thiffault,
Plaintiff,
By his Attorney,

</div>

Dated: 1-19-2005

Karen L. Stern, Esquire
BBO#550391
BERNSTEIN, BURWICK & TUCKER, LLC
10 Mechanic Street, Suite 150
Worcester, MA  01608
(508) 755-5555

**EXHIBIT 1**



# SUN LIFE ASSURANCE COMPANY OF CANADA

| | |
|---|---|
| **Policyholder**: | EASY DAY MANUFACTURING COMPANY |
| **Policy Number**: | 44365 |
| **Policy Effective Date**: | February 1, 1997 |
| **Policy Anniversary**: | February 1, 1998 |
| **Date of Issue**: | March 13, 1997 |

This Policy is delivered in Massachusetts and is subject to the laws of that jurisdiction. Premiums are due and payable monthly on the first day of each month. Policy anniversaries will be annual beginning on February 1, 1998.

Sun Life Assurance Company of Canada ("Sun Life") agrees to pay the benefits in accordance with all provisions provided by this Policy for Life and Accidental Death and Dismemberment and Long Term Disability Insurance. This Policy is issued in consideration of the Application of the Policyholder, a copy of which is attached, and continued payment of premiums by the Policyholder. The following pages including any Riders, Endorsements or Amendments are a part of this Policy.

For the purpose of effective dates and termination dates under this Policy, all days begin and end at 12:00 midnight.

Signed at Sun Life's U.S. Headquarters in Wellesley Hills, MA.

*Donald A. Stewart*

President

## READ YOUR POLICY CAREFULLY

Group Term Insurance Policy

93P-LH

Policy Face Page

**Page Numbers**

| Section I | Schedule of Benefits | 3 |
| Section II | Definitions | 6 |
| Section III | Eligibility and Effective Date | 14 |
| Section IV | Employee Life Insurance | 16 |
| Section IV | Accidental Death and Dismemberment Insurance | 22 |
| Section IV | Long Term Disability Income Benefits | 24 |
| Section V | Termination Provisions | 34 |
| Section VI | General Policy Provisions | 38 |
| Section VII | Claim Provisions | 41 |
| Section VIII | Premiums | 44 |

93P-LH-TAB

Table of Contents
February 1, 1997

**Section I**
**Schedule of Benefits**

## ELIGIBLE CLASSES

All Full-Time Salaried Employees

Working a minimum of 30 hours per week

## WAITING PERIOD

30 days

## LIFE AND ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE

## CLASSIFICATION

Class A          All Employees

| CLASS | LIFE | AD&D |
|-------|------|------|
| A | 2 times the Employee's Basic Annual Earnings* | An amount equal to the Employee's amount of Life Insurance in force |

\*       rounded to the next higher $1,000, if not already a multiple of $1,000, subject to a **Maximum** **Benefit** of $150,000.

An Employee's Amount of Life and Accidental Death and Dismemberment Insurance shown in the Schedule will reduce to 50% when he attains age 70. An Employee's Life and Accidental Death and Dismemberment Insurance terminates at the Employee's retirement.

# LONG TERM DISABILITY INSURANCE

## CLASSIFICATION

Class 1          All Employees, excluding the Chairman of the Board

Class 1

     a.     The **Benefit Percentage** is 60%.

     b.     The **Maximum Monthly Benefit** is $6,000.

    **Integration Method:**

        Direct

   The **Minimum Monthly Benefit** is $100.

## Elimination Period

   180 days

## Maximum Benefit Period

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | To age 65, but not less than 60 months |
| 60 | 60 Months |
| 61 | 48 Months |
| 62 | 42 Months |
| 63 | 36 Months |
| 64 | 30 Months |
| 65 | 24 Months |
| 66 | 21 Months |
| 67 | 18 Months |
| 68 | 15 Months |
| 69 and over | 12 Months |

93P-LH-SCHED

Schedule of Benefits
February 1, 1997

## CONTRIBUTIONS

Employees will not contribute to the cost of their Life and Accidental Death and Dismemberment Insurance.

Employees will contribute to the cost of their Long Term Disability Insurance.

## INITIAL MONTHLY PREMIUM RATES

| | |
|---|---|
| Life Insurance | To Be Advised |
| Accidental Death and Dismemberment Insurance | To Be Advised |
| Long Term Disability Insurance | To Be Advised |

The initial monthly premium rates are guaranteed for 24 months from February 1, 1997 unless otherwise specified in Section VIII, Premiums.  See Section VIII, Premiums for more information.

93P-LH-SCHED

In this section Sun Life defines some basic terms needed to understand this Policy. All male terms include the female term, unless stated otherwise.

**For purposes of this Policy:**

**Actively at Work** means that an Employee performs all the regular duties of his job for a full work day scheduled by the Employer at the Employer's normal place of business or a site where the Employer's business requires the Employee to travel.

An Employee is considered Actively at Work on any day that is not his regular scheduled work day (i.e., vacation, layoff or an approved leave of absence), if the Employee:
  - is not hospital confined; or
  - is not disabled due to an injury or sickness; and
  - was Actively at Work on his immediately preceding scheduled work day.

An Employee is considered Actively at Work if he usually performs the regular duties of his job at his home, if the Employee:
  - is not hospital confined; or
  - is not disabled due to an injury or sickness; and
  - can perform all the regular duties of his job for a full work day and could do so at the Employer's normal place of business if required to do so.

**Application** means the document pertaining to the plan of insurance applied for by the Policyholder. This document is attached to this Policy.

**Certificate** means a written booklet prepared by Sun Life which includes any Riders, Endorsements or Amendments, illustrating a summary of:
1. the insurance benefits an Employee is entitled to;
2. to whom the benefits are payable; and
3. any limitations, exclusions or requirements that may apply.

**Contributory Insurance** means Long Term Disability Insurance for which the Employee is required to pay all or part of the premium.

**Eligibility Date** means the date or dates an Employee becomes eligible for insurance under this Policy. Classes eligible for insurance are shown in Section I, Schedule of Benefits.

**Employee** means a person who is employed by the Employer, working at least the number of hours shown in Section I, Schedule of Benefits, and paid regular earnings.

**Employer** means the Policyholder and includes any Subsidiary, Affiliated or Associated company named in the Application.

93P-LH-DEF

**Definitions**

**Evidence of Insurability** means a statement or proof of an Employee's medical history upon which acceptance for insurance will be determined by Sun Life.

**Grace Period** means the 31 days following a premium due date during which premium payment may be made.

**Hospital or Institution** means a facility licensed to provide full-time medical care and treatment under the direction of a full-time staff of licensed physicians.

**Injury** means bodily impairment resulting directly from an accident and independently of all other causes. Any Injury must occur and any disability must begin while the Employee is insured under this Policy.

**Non-Contributory Insurance** means Life and Accidental Death and Dismemberment Insurance for which the premium is paid entirely by the Employer.

**Physician** means an individual who is operating within the scope of his license and is either:

1. licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
2. legally qualified as a medical practitioner and required to be recognized, under this Policy for insurance purposes, according to the insurance regulations of the governing jurisdiction.

The Physician cannot be the Employee, his spouse or the parents, brothers, sisters or children of the Employee or his spouse.

**Policyholder** means the entity to whom the Policy is issued.

**Pregnancy** means childbirth, miscarriage, abortion or any disease resulting from or aggravated by the pregnancy.

**Sickness** means illness, disease or pregnancy. Any disability, because of Sickness, must begin while the Employee is insured under this Policy.

**U.S. Headquarters** means Sun Life Assurance Company of Canada, Wellesley Hills, MA 02181.

**Waiting Period** means the continuous length of time immediately before an Employee's Eligibility Date during which he must be in an Eligible Class. Any period of time prior to the Policy Effective Date the Employee was Actively at Work for the Employer will count towards completion of the Waiting Period. The Waiting Period is shown in Section I, Schedule of Benefits.

93P-LH-DEF

Definitions
February 1, 1997

**Section II**
**Definitions**

## The following Definitions are applicable to Life Insurance

**Basic Annual Earnings** means the Employee's current salary or wage from the Employer. Basic Annual Earnings does not include commissions, bonuses, overtime pay or any other extra compensation.

**Beneficiary** means the person (other than the Employer) who is entitled to receive death benefit proceeds as they become due under this Policy. A person becomes the Employee's Beneficiary only if the Employee has named that person on a form acceptable to Sun Life and signed by the Employee.

**Certified or Certification** means a written statement made by a Physician, on a form provided by Sun Life, as to the Employee's Total and Permanent Disability.

**Maximum Benefit** means the largest amount of insurance available to an Employee under this Policy. The Maximum Benefit is shown in Section I, Schedule of Benefits.

**Retirement** means the first of the following to occur:

1. the effective date of the Employee's retirement benefits under:
   a.  any plan of a federal, state, county, municipal or an association retirement system which the Employee is eligible as a result of his employment with the Employer;
   b.  any plan the Employer sponsors; or
   c.  any plan the Employer:
       i.   makes contributions to; or
       ii.  has made contributions.

2. the effective date of the Employee's retirement benefits under the Social Security Act or any similar plan or act. However, if the Employee meets the definition of Employee and is receiving retirement benefits under the Social Security Act or similar plan or act, the Employee will not be considered retired.

**Total Disability or Totally Disabled** means an Employee, because of Injury or Sickness, is unable to perform the material and substantial duties of any occupation for which he is or becomes reasonably qualified by education, training or experience.

## Section II
## Definitions

**Total and Permanent Disability or Totally and Permanently Disabled** for the purposes of eligibility under the Accelerated Benefit, means one or more of the following qualifying events:

1.  an Employee's medical condition that includes the following specifically named or described conditions. The Physician must certify that the Employee's condition requires extraordinary medical intervention without which the Employee will die. These medical conditions include:
    a.    major organ transplant;
    b.    a medical condition requiring continuous artificial life support;
    c.    coronary artery disease that results in an acute infarction or requiring surgery;
    d.    permanent neurological deficit resulting from a cerebral vascular accident;
    e.    end stage renal failure;
    f.    Acquired Immune Deficiency Syndrome.

2.  an Employee's Sickness or physical condition that is Certified by a Physician to reasonably be expected to result in death within 24 months or less.

**Section II**
**Definitions**

## The following Definitions are applicable to Long Term Disability Insurance

**Disability Benefit** when used with the term Retirement Plan, means a benefit which:

1.    is payable under a Retirement Plan due to a disability as defined in that Plan; and

2.    does not reduce the amount which would have been paid as Retirement Benefits at the normal retirement age under the Plan if the disability had not occurred.

**Drug and Alcohol Illness** means an illness which results from the abuse of alcohol, drugs or derivatives.

**Elimination Period** means a period of continuous days of Total or Partial Disability for which no LTD Benefit is payable. The Elimination Period is shown in Section I, Schedule of Benefits and begins on the first day of Total or Partial Disability.

If the Employee returns to work for 15 working days or less during the Elimination Period and cannot continue working, the Total or Partial Disability will be treated as continuous. Only those days that the Employee is Totally or Partially Disabled will count toward satisfying the Elimination Period.

**Family Social Security** means benefits that are paid by the Federal Social Security Act to an eligible spouse and/or children as a result of the Employee's Total or Partial Disability.

**Gross Monthly Benefit** means the Employee's Monthly Benefit before any reduction of Other Income Benefits as described in Section IV, Long Term Disability Income Benefits.

**Indexed Total Monthly Earnings** means the Employee's Total Monthly Earnings prior to the date his Total or Partial Disability began adjusted on the first of the month following 12 calendar months of Partial Disability Benefit payments and each annual anniversary thereafter. Each adjustment to the Indexed Total Monthly Earnings is the lesser of 10% or the current annual percentage increase in the Consumer Price Index for Wage Earners and Clerical Workers as published monthly by the U.S. Department of Labor. Sun Life reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the Consumer Price Index.

**LTD** means Long Term Disability.

**Maximum Monthly Benefit** means the largest amount payable monthly to an Employee under this Policy. The Maximum Monthly Benefit is shown in Section I, Schedule of Benefits.

**Mental Illness** means mental, nervous, psychological, emotional diseases, or behavioral disorders of any type.

93P-LH-DEF

Definitions
February 1, 1997

**Section II**
**Definitions**

All Directors, Managers Supervisors, excluding the Chairman of the Board

**Total Disability or Totally Disabled** means the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation.

The loss of a professional or occupational license or the inability to obtain or qualify for a license for any reason does not, in itself, constitute Total Disability.

To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of Total or Partial days of Disability.

All Other Employees, excluding the Chairman of the Board

**Total Disability or Totally Disabled** means during the Elimination Period and the next 24 months of Total Disability, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation. After benefits have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform all of the material and substantial duties of any occupation for which he is or becomes reasonably qualified for by education, training or experience.

The loss of a professional or occupational license or the inability to obtain or qualify for a license for any reason does not, in itself, constitute Total Disability.

To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of Total or Partial days of Disability.

**Total Monthly Earnings** means the Employee's basic monthly earnings as reported by the Employer immediately prior to the first date Total or Partial Disability begins. Total Monthly Earnings does not include commissions, bonuses, overtime pay or any other extra compensation.

## Section III
## Eligibility and Effective Dates

### Delayed Effective Date of Insurance

The Effective Date of any initial, increased or additional insurance will be delayed for an Employee if he is not Actively at Work due to injury, sickness, layoff or leave of absence. The initial, increased or additional insurance will become effective on the date the Employee returns to an Actively at Work status.

### Refusal of Coverage

If an eligible Employee declines his insurance, or terminates his insurance while continuing to be eligible, by signing a refusal card, an eligible Employee will become insured after he applies for insurance and Evidence of Insurability is approved by Sun Life. Evidence of Insurability is at the Employee's expense.

### Changes in Insurance

Changes in an Employee's amount of insurance due to a:
- change in an Employee's salary;
- change in an Employee's classification for insurance;
- change in an Employee's age;

will take effect immediately upon the date of change. However, any increase in insurance will be subject to the Delayed Effective Date of Insurance provision.

## Section IV
## Benefit Provisions

All amounts of life insurance under this Waiver of Premium Provision are subject to the same Policy terms and conditions including subsequent reductions and terminations at specified ages and/or at retirement as would have been applicable had the Employee not been Totally Disabled. This amount will be further reduced by the amount of any individual policy issued to the Employee pursuant to the Conversion Privilege of this Policy unless that individual policy is exchanged for a full refund of premiums paid.

Sun Life has the right to designate a Physician to examine the Employee when and as often as may be reasonably required.

The Waiver of Premium for an Employee ceases on the earliest of:
- the date he ceases to be Totally Disabled;
- the date he fails to furnish any required Proof that he continues to be Totally Disabled;
- the date he fails to submit to any required Examinations;
- any period the Employee is not under the regular and continuing care of a Physician providing appropriate treatment by means of examination and testing in accordance with the disabling condition;
- the date he retires; or
- the date he attains age 70.

An Employee is deemed to be retired when he receives any compensation from a retirement or pension plan of the Employer or when the Employee attains age 70, whichever occurs first.

An Employee's rights to continued benefits pursuant to this Waiver of Premium Provision are determined on the date Total Disability begins. These rights are subject to the terms of this Policy and will not be affected by subsequent amendment or termination of this Waiver of Premium Provision.

## Accelerated Benefit

Sun Life will pay an Accelerated Benefit to the Employee at the Employee's request, if Sun Life receives satisfactory Certification that the Employee is Totally and Permanently Disabled.

To be eligible for the Accelerated Benefit an Employee must:

(Applicable to Employees employed on or before February 1, 1997)

- have been Actively at Work on February 1, 1997 and insured under the Life Insurance Benefit Provision for at least 30 days. This 30 day period is waived for qualifying events due to an accidental Injury. Any period of time the Employee was insured for similar benefits under the previous insurer's group life policy will be used to satisfy this requirement;

93P-LH-LIFE.1

Life Benefit Provision
February 1, 1997

## Section IV
## Benefit Provisions

If the Employee is eligible for Waiver of Premium, the amount of life insurance remaining in force on which premiums are waived will be based on the reduced amount of life insurance.

If the Employee subsequently converts his amount of life insurance, the amount eligible for conversion will be based on the reduced amount of life insurance.

If the Employee is insured for Accidental Death and Dismemberment Insurance, such amount shall not be affected by the payment of any Accelerated Benefit.

**Conversion Privilege**

**Benefit**

1.  If all or part of an Employee's Life Insurance ceases or reduces due to:
    - termination of his employment; or
    - termination of his membership in an Eligible Class; or
    - the Employee's retirement; or
    - the Employee reaching a specified age; or
    - the Employee changing to a different Eligible Class; or
    - termination of the Employee's Waiver of Premium continuation; or
    - the Employee's continuation period ending during layoff or an approved leave of absence;

    then the Employee may apply for an individual policy on his own life up to the amount that ceased. If the amount of Life Insurance that ceased is $10,000 or more, the minimum amount of the individual policy must be $10,000.

2.  If the Employee has been continuously insured for five or more years under this Policy's Life Benefit Provision and all or part of the Employee's Life Insurance ceases or reduces due to:
    - reduction of the amount of Life Insurance in an Eligible Class by an amendment to the Life Insurance Benefit Provision; or
    - termination of the Life Insurance Benefit Provision; or
    - termination of this Policy; or
    - termination of an Eligible Class by an amendment to the Life Insurance Benefit Provision;

    then the Employee may apply for an individual policy on his own life. The maximum amount of the policy will be the lesser of:
    - $2,000; or
    - the amount that ceased, reduced by the amount of any life insurance the Employee is eligible for under any group policy within 31 days after his Life Insurance ceased.

The Employee will be issued an individual policy without Evidence of Insurability.

**Section IV**
**Benefit Provisions**

**Continuity of Coverage**

In order to prevent loss of coverage for an Employee when this Policy replaces a group Life policy the Employer had in force with another insurer immediately prior to February 1, 1997, Sun Life will provide the following coverage.

**Employees not Actively at Work on February 1, 1997**

An Employee may become insured under this Policy on February 1, 1997, subject to all of the following conditions:

1.  he was insured under the prior insurer's group Life policy immediately prior to February 1, 1997; and
2.  he is not Actively at Work on February 1, 1997; and
3.  he is a member of an Eligible Class under this Policy; and
4.  premiums for the Employee are paid up to date; and
5.  he is not receiving or eligible to receive benefits under the prior insurer's group Life policy.

Any Life benefit payable will be the lesser of:
  -  the Life benefit payable under this Policy; or
  -  the Life benefit payable under the prior insurer's group Life policy had it remained in force.

All other provisions of Sun Life's Policy will apply.

93P-LH-LIFE.1

Life Benefit Provision
February 1, 1997

## Section IV
## Benefit Provisions

### Exclusions

Payment will not be made for a loss which is due to or results from:
- suicide while sane or insane, or intentionally self-inflicted injuries; or
- bodily or mental infirmity or disease of any kind, or infection unless due to an accidental cut or wound; or
- committing or attempting to commit an assault, felony or other illegal act; or
- war (declared or undeclared) or active duty in any armed service during a time of war; or
- active participation in a riot, rebellion, or insurrection.

### Continuity of Coverage

In order to prevent loss of coverage for an Employee when this Policy replaces a group AD&D policy the Employer had in force with another insurer immediately prior to February 1, 1997, Sun Life will provide the following coverage.

### Employees not Actively at Work on February 1, 1997

An Employee may become insured under this Policy on February 1, 1997, subject to all of the following conditions:

1. he was insured under the prior insurer's group AD&D policy immediately prior to February 1, 1997; and
2. he is not Actively at Work on February 1, 1997; and
3. he is a member of an Eligible Class under this Policy; and
4. premiums for the Employee are paid up to date; and
5. he is not receiving or eligible to receive benefits under the prior insurer's group AD&D policy.

Any AD&D benefit payable will be the lesser of:
- the AD&D benefit payable under this Policy; or
- the AD&D benefit payable under the prior insurer's group AD&D policy had it remained in force.

All other provisions of Sun Life's Policy will apply.

93P-LH-AD&D.1

Accidental Death and
Dismemberment Benefit Provisions
February 1, 1997

**Section IV**
**Benefit Provisions**

To determine the Total Disability Benefit:

1.  Take the lesser of:

    a.  the Employee's Total Monthly Earnings multiplied by the Benefit Percentage (shown in Section I, Schedule of Benefits); or

    b.  the Maximum Monthly Benefit (shown in Section I, Schedule of Benefits); then

2.  Subtract Other Income Benefits from the amount determined in Step 1.

**Partial Disability Benefit**

If an Employee is Partially Disabled, the Net Monthly Benefit will be calculated based on the Partial Disability Benefit formula. An Employee qualifies for this benefit if, after completion of the Elimination Period, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation on a full-time basis, but he is:

1.  performing at least one of the material and substantial duties of his own occupation or another occupation on a part-time or full-time basis; and

2.  earning less than 80% of his Total Monthly Earnings due to the same Injury or Sickness that caused the Total or Partial Disability. After 12 months of Partial Disability Benefits, Total Monthly Earnings will be Indexed Total Monthly Earnings.

During the first 24 months that an Employee returns to work, in his own occupation or another occupation, and is earning more than 20% of his Indexed Total Monthly Earnings, a Partial Disability Benefit will be paid.

To determine the Partial Disability Benefit:

1.  add the Employee's earnings from employment and income received from Other Income Benefits to the Total Disability Benefit.

2.  if this sum is in excess of 100% of the Employee's Indexed Total Monthly Earnings, subtract the amount in excess of 100% from the Total Disability Benefit. This result is the Partial Disability Benefit; or

    if the sum is less than 100% of the Employee's Indexed Total Monthly Earnings, the Partial Disability Benefit is the Total Disability Benefit.

If the Employee is earning 20% or less of his Indexed Total Monthly Earnings, a Total Disability Benefit will be paid.

93P-LH-LTD.2

Long Term Disability Income Benefit
February 1, 1997

**Section IV**
**Benefit Provisions**

4.  Any disability income benefits the Employee is eligible for under:
    a.  any other group insurance plan of the Employer;
    b.  any governmental retirement system as a result of the Employee's job with his Employer.

5.  The benefits the Employee receives under his Employer's Retirement Plan as follows:
    a.  any disability benefits;
    b.  the Employer-paid portion of any retirement benefits.
    (Disability benefits that reduce the Employee's accrued Retirement Benefit will be treated as a retirement benefit. Retirement benefits do not include any amount rolled over or transferred to any other retirement plan as defined in Section 402 of the Internal Revenue Code.)

6.  The disability or retirement benefits under the United States Social Security Act, or any similar plan or act, as follows:
    a.  Disability benefits the Employee is eligible to receive;
    b.  Disability benefits the Employee's spouse, child or children are eligible to receive because of the Employee's Total or Partial Disability unless the dependent benefits are paid directly to the divorced spouse or to the children in custody of the divorced spouse.
    c.  Retirement benefits received by the Employee;
    d.  Retirement benefits the Employee's spouse, child or children receive because of the Employee's receipt of retirement benefits unless the dependent benefits are paid directly to the divorced spouse or to the children in custody of the divorced spouse.

    If an Employee's Total or Partial Disability begins after age 70, Social Security Retirement Benefits will not apply if, prior to his Total or Partial Disability, he was already receiving Social Security Retirement Benefits.

7.  The amount the Employee receives from any accumulated sick leave.

8.  Any formal salary continuation paid to the Employee by his Employer which causes the Net Monthly Benefit, plus Other Income Benefits and any salary continuation to exceed 100% of the Employee's Total Monthly Earnings.  The amount in excess of 100% of the Employee's Total Monthly Earnings will be used as a reduction.

9.  Any amount the Employee receives by compromise, settlement or other method as a result of a claim for any Other Income Benefit.

Other Income Benefits will include any amount described above which would have been available to the Employee had he applied for that benefit.

93P-LH-LTD.2

Long Term Disability Income Benefit
February 1, 1997

**Section IV**
**Benefit Provisions**

## Waiver of Premium for Totally or Partially Disabled Employees

LTD premium payments for a Totally or Partially Disabled Employee are waived during any period LTD benefits are payable under this Policy. If this Policy is in force when the Employee's Total or Partial Disability ends, the Employee will remain insured if he returns to an Actively at Work status in an Eligible Class and premium payments for the Employee are resumed.

## Termination of Long Term Disability Benefits

Total or Partial Disability Benefits will cease on the earliest of:

1.    the date the Employee is no longer Totally or Partially Disabled;

2.    the date the Employee dies;

3.    the end of the Maximum Benefit Period;    *AGE 65*

4.    the date the Employee fails to provide adequate employment earnings information or proof of continuing Total or Partial Disability as requested;

5.    the date the Employee's current earnings exceed 80% of his Indexed Total Monthly Earnings;

### All Directors, Managers Supervisors, excluding the Chairman of the Board

6.    the date Sun Life determines the Employee is able to perform on a full-time basis all of the material and substantial duties of his own occupation, even if the Employee chooses not to work.

### All Other Employees, excluding the Chairman of the Board

7.    for the first 24 months of Total Disability or for Partial Disability, the date Sun Life determines the Employee is able to perform on a full-time basis all of the material and substantial duties of his own occupation, even if the Employee chooses not to work;

8.    after the first 24 months of Total Disability, the date Sun Life determines the Employee is able to perform on a full-time basis all of the material and substantial duties of any occupation for which the Employee is or becomes reasonably qualified for by education, training or experience, even if the Employee chooses not to work.

93P-LH-LTD.2

Long Term Disability Income Benefit
February 1, 1997

**Section IV**
**Benefit Provisions**

3.  any period of Total or Partial Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care.

    Benefits will be payable for the first 24 months after the Employee completes his Elimination Period.

    Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution licensed to provide psychiatric treatment.

4.  any period of Total or Partial Disability due to Drug and Alcohol Illness, unless the Employee is actively supervised by a Physician or Rehabilitation Counselor and is receiving continuing treatment from a rehabilitation center or a designated institution approved by Sun Life.

    Benefits will be payable for the first 24 months after the Employee completes his Elimination Period if, during the Elimination Period the Employee:

    a)  becomes confined in a Hospital or Institution licensed to provide Drug and Alcohol treatment; or

    b)  begins participation in a Drug or Alcohol Rehabilitation Program acceptable to Sun Life.

    Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution licensed to provide Drug and Alcohol treatment.

5.  any period of Total or Partial Disability which begins in the first 12 months after the Employee's Effective Date of Insurance that is caused by, contributed to by, or resulting from a Pre-Existing Condition unless the Total or Partial Disability begins after a period of 3 consecutive months after the Employee's Effective Date of Insurance, during which he has not received medical treatment, consultation, care or services, including diagnostic measures, or taken prescribed drugs or medicines.

    A Pre-Existing Condition means any Injury or Sickness for which the Employee has received medical treatment, consultation, care or services, including diagnostic measures, or took prescribed drugs or medicines within 3 months prior to his Effective Date of Insurance.

**Exclusions**

No LTD benefit will be payable for any Total or Partial Disability that is due to:

1.  intentionally self-inflicted injury;
2.  war, declared or undeclared, or any act of war;
3.  active participation in a riot, rebellion or insurrection; or
4.  committing or attempting to commit an assault, felony or other illegal act.

93P-LH-LTD.2

Long Term Disability Income Benefit
February 1, 1997

**Section IV**
**Benefit Provisions**

Any benefit payable will be determined as follows:

1.   if an Employee satisfies the Pre-Existing Condition Limitation under this Policy, the LTD benefit will be determined according to this Policy's benefit provision.

2.   if an Employee cannot satisfy this Policy's Pre-Existing Condition Limitation, the prior insurer's pre-existing condition limitation will be applied.

    a.   if the Employee satisfies the prior insurer's pre-existing condition limitation, giving consideration for continuous time insured under both policies, any benefit payable will be the lesser of:

        i.   the LTD benefit payable under this Policy; or

        ii.  the LTD benefit payable under the prior insurer's group LTD policy had it remained in force.

    b.   if the Employee cannot satisfy the Pre-Existing Condition Limitation of this Policy or that of the prior insurer's group LTD policy, no LTD benefit will be paid.

93P-LH-LTD.2

Long Term Disability Income Benefit
February 1, 1997

## Section V
## Termination Provisions

While this Policy is in force, the Policyholder may continue an Employee's coverage pursuant to the Family and Medical Leave Act of 1993, as amended or continue coverage pursuant to a state required continuation period (if any).

While this Policy is in force, the Policyholder may continue an Employee's coverage pursuant to the Uniformed Services Employment and Reemployment Rights Act (USERRA).

93P-LH-TERM.1

Termination – Provisions
February 1, 1997

**Section V**
**Termination Provisions**

## Termination of Benefit Provision

A Benefit Provision will terminate for any of the following reasons:

1.  The Policyholder may terminate a Benefit Provision by advance written notice delivered to Sun Life at least 31 days prior to the termination date. The Benefit Provision will not terminate during any period in which premium has been paid. The Benefit Provision will be liable to Sun Life for all premiums due and unpaid for the full period that Benefit Provision is in force.

2.  Sun Life may terminate a Benefit Provision on any premium due date by giving written notice to the Policyholder at least 31 days in advance if:

    a.  the number of insured Employees for that Benefit is less than 25; or

    b.  less than 100% of the Employees eligible for that Benefit are insured for Non-Contributory Insurance; or

    c.  less than 75% of the Employees eligible for that Benefit are insured for Contributory Insurance; or

    d.  the Policyholder fails to furnish promptly any information Sun Life may reasonably require.

3.  Sun Life may terminate any Benefit Provision on any premium due date by giving written notice to the Policyholder at least 60 days in advance.

Termination of a Benefit Provision may take effect on an earlier date when both the Policyholder and Sun Life agree.

**Section VI**
**General Policy Provisions**

**D.    Furnishing of Information - Access To Records**

    1.    The Employer will furnish at regular intervals to Sun Life:

        a.    information relative to individuals:
            i.    who qualify to become insured;
            ii.    whose amounts of insurance change; and/or
            iii.    whose insurance terminates.
        b.    any other information about this Policy that may be reasonably required.

The records which, in the opinion of Sun Life, are material to the insurance, will be opened for inspection by Sun Life at any reasonable time.

    2.    Clerical error or omission will not:
        a.    deprive an individual of insurance;
        b.    affect an individual's amount of insurance; or
        c.    effect or continue an individual's insurance which otherwise would not be in force.

The Policyholder's failure to report notice or proof of claim in a timely manner shall not constitute clerical error.

**E.    Misstatement of Facts**

If relevant facts about any individual were not accurate:
    1.    an equitable adjustment of premium will be made; and
    2.    the true facts will be used to determine if and in what amount insurance is valid under this Policy.

If the amount of the benefit is dependent upon an individual's age, (as shown in Section I, Schedule of Benefits), the benefit will be the amount an individual would have been entitled to if his correct age was known.

If an adjustment results in a refund of premium, the refund will not exceed a period of more than 12 months.

**F.    Examination and Autopsy**

Sun Life, at its own expense, has the right to have any person, whose Injury or Sickness is the basis of a claim:

    1.    examined by a Physician, other health professional or vocational expert of its choice; and/or
    2.    interviewed by an authorized Sun Life representative.

93P-LH-GENP

General Policy Provisions
February 1, 1997

**Section VII**
**Claim Provisions**

## A.    Notice and Proof of Claim

Sun Life must receive Notice and Proof of Claim prior to any payment under this Policy.

1.    Notice

**for Death Claim** - written notice of claim must be given to Sun Life no later than 30 days after date of death.

**for Life Waiver of Premium** - written notice of claim must be given to Sun Life no later than 12 months after the Employee ceases to be Actively at Work.

**for Accidental Dismemberment** - written notice of claim must be given to Sun Life no later than 12 months after the Employee's date of loss.

**for Long Term Disability** - written notice of claim must be given to Sun Life no later than 30 days before the end of the applicable Elimination Period or, within 30 days of the termination of this Policy, if earlier.

If notice cannot be given within the applicable time period, Sun Life must be notified as soon as it is reasonably possible.

When Sun Life has received written notice of claim, Sun Life will send the forms for proof of claim. If the forms are not received within 15 days after written notice of claim is sent, proof of claim may be sent to Sun Life without waiting for the form.

2.    Proof

**for Death Claim** - proof of claim must be given to Sun Life no later than 90 days after date of death.

**for Life Waiver of Premium** - proof of claim must be given to Sun Life no later than 15 months after the Employee ceases to be Actively at Work.

**for Accidental Dismemberment** - proof of claim must be given to Sun Life no later than 15 months after the Employee's date of loss.

**for Long Term Disability** - proof of claim must be given to Sun Life no later than 90 days after the end of the Elimination Period.

93P-LH-CLAIM.2

Claim Provisions
February 1, 1997

**EXHIBIT 2**

 **Sun Life of Canada**®

One Sun Life Executive Park
Wellesley Hills, MA 02481

Tel: (781) 237-6030
(800) 225-3950

April 15, 2002

Mr. Victor Thiffault
194 S. Main Street
Hopendale, MA  01747

RE:     Policy:                    44365- Group Long Term Disability
        Control Number:     211098-20000

Dear Mr. Thiffault:

I am writing in regards to your Long Term Disability Claim.

Your policy states:

*Total Disability or Totally Disabled means the Employee, because of Injury of Sickness, is unable to perform all of the material and substantial duties of his own occupation.*

*The loss of the professional or occupational license or the inability to obtain or qualify for any reason does not in itself, constitute total disability.*

*To qualify for benefits, the Employee must satisfy must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or combination of Total or Partial of Disability.*

*Mental Illness means mental, nervous, psychological, emotional diseases or behavioral disorders of any type*

*Elimination period means a period of continuous days of Total or Partial Disability for which no LTD Benefit is payable. ...(The Elimination period) begins on the first day of Total or Partial Disability*

*Limitations*

3.  *any period of Total or Partial Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care.*

    *Benefits will be payable for the first 24 months after the Employee completed his Elimination Period*

*Benefits after 24 months will only be payable if the employee is confined in a hospital or Institution licensed to provide psychiatric treatment*

According to your policy, your claim is evaluated based on your ability to perform the material and substantial duties of your occupation as the Director of Distribution. We have reviewed all of the documentation that is currently in file, including, but not limited to medical records, diagnostic test results and questionnaires completed by you and your health care providers.

We initially approved your claim on December 28, 1998 on a good faith basis, while we waited to make a formal determination on your claim. On January 6, 1999, Alice M. Cluette, R.N. reviewed the contents of your file. Ms. Cluette stated in her review that "Mr. Thiffault's sleep apnea appears to be well controlled with the use of CPAP and changes in meds. (medications). He claims to have restorative sleep at present. His complaints of periodic limb movements most definitely would not preclude him from performing his own occ. (own occupation). However, he does appear to have some psych issues which need to be addressed."

On March 3, 1999, Ronald Pies, MD indicates in a review of your file that "...this claimant clearly does have a sleep disorder, most likely stemming from several causes including use of Tricyclies, which can worsen periodic leg movements..." Additionally, Dr. Pies concludes that "there are insufficient objective data to establish that this claimant is vocationally incapacitated owing to a psychiatric or neuropsychiatric disorder."

On March 12, 1999, Hatty Tsai, MD of Sun Life Financial reviewed the contents of your file. In this review, Dr. Tsai indicated that, "review of polysomnography reports indicated mild obstructive apnea... which resolved with CPAP treatment. There was a problem with periodic leg movements that caused fragmented sleep. The limb movement disorder was treated with medications with apparently good results. In 9/98 note, Dr. Trotten states claimant was 'getting a substantial nights sleep' and complaint of increasing fatigue later in the day not likely to be related to his sleep apnea." Dr. Tsai further indicates that "in 7/98 note, Dr. Phadke stated that the CPAP treatment eliminated the sleep apnea." Concluding, Dr. Tsai stated that there "is no evidence to support any R + L (Restrictions and Limitations) that would preclude claimant from returning to his own occupation."

On April 28, 1999, you underwent a neuropsychological examination under the supervision of David A. Gansler, Ph.D. Upon receipt of this report, Ms. Shelly Pratt, MSW, LISCW, ASWCM, and Dr. Ronald Pies reviewed this information. Dr. Pies indicates in his review that "given the GAF score of 45 and Dr. Gangler's overall impressions, I believe that –at present- there is sufficient evidence to establish a substantial degree of vocational incapacity. However, this does

not mean the claimant has reached the highest possible level of functioning, or that he will never be able to return to work."

On the Attending Physician's Statement signed and dated January 3, 2002 by Dr. Joseph Grimaldi, he indicated that your diagnoses are sleep apnea, Depressive Disorder and Attention Deficit Disorder. Furthermore, Dr. Grimaldi does not indicate any restrictions or limitations.

Based on the material currently in your file, there is no evidence to support your physical inability to perform the material and substantial duties of your own occupation as the Director of Distribution and Facilities. Although Dr. Grimaldi indicates that you are not able to work, there is no medical evidence to support ongoing disability.

We understand that you are continuing to treat with Dr. Grimaldi for psychological treatment. Dr. Grimaldi has indicated that you suffer from Depressive Disorder and Attention Deficit Disorder. In order for benefits to continue to be paid after 24 months for a psychiatric condition, the insured must be confined in a hospital. Since you are not hospitalized, no further Long Term Disability Benefits are payable for any psychiatric condition. Because we are not able to issue benefits for either a physical or psychiatric condition, your claim has been closed. Benefits have been paid through March 31, 2002.

If you disagree with our decision, you may request in writing a review of the denial within 180 days after receiving this notice of denial. Additionally, you may wish to submit any medical documentation that would verify that you are not physically able to perform the material and substantial duties of a Director of Distribution and Facilities.

You may submit written comments, documents, records or other information relating to your claim for benefits, and may request free of charge copies of all documents, records, and other information relevant to your claim for benefits.

We will review your claim on receipt of the written request for review, and will notify you of our decision within a reasonable period of time but not later than 45 days after the request has been received. If an extension of time is required to process the claim, we will notify you in writing of the special circumstances requiring the extension and the date by which we expect to make a determination on review. The extension cannot exceed a period of 45 days from the end of the initial review period.

If a period of time is extended because you failed to provide information necessary to decide your

claim, the period for making the decision on review is tolled from the date we send notice of the extension to you until the date on which you respond to the request for additional information. You will have 60 days to provide the specified information.

You have the right to bring a civil action under the Employee Retirement Income Security Act of 1974 (ERISA), §502(a) following an adverse determination on review.

Your request for a review should be addressed to:

> Sun Life Financial
> Appeals Unit
> P.O. Box 81601
> Wellesley Hills, MA 02481-0006

Please feel free to call this office at 800.247.6875 if you have any questions.

Sincerely,

Peter Mahoney
Associate Claims Administrator
SC 3208/Group LTD

**EXHIBIT 3**

 **Sun Life of Canada**

One Sun Life Executive Park
Wellesley Hills, MA 02481

Tel: (781) 237-6030
(800) 225-3950

February 5, 2003

Bernstein, Burwick & Tucker, LLC
Attn.: Karen Stern
10 Mechanic St., Suite 150
Worcester, MA 01608

Re:    Policy No.:    44365-Long Term Disability
       Control No.:   211098-20000
       Claimant:      Victor Thiffault

Dear Ms. Stern,

We are writing to you at this time concerning your request for appeal of Victor Thiffault's Long Term Disability claim. After a full and fair review of all information in the file as well as the additional information you supplied with your request for appeal, we have made a final determination on this appeal. Unfortunately, based on the information received and in file, we must reaffirm our denial of benefits under the provisions of this policy. Thus, no further benefits are due Mr. Thiffault, and our file will remain closed.

The policy contract specifically provides the criteria by which an insured can be considered totally disabled. This criteria consists of, but is not limited to, the following quotations from the contract:

*"If Sun Life receives Notice and Proof of Claim that an Employee is Totally or Partially Disabled, a Net Monthly Benefit will be payable, subject to the Limitations and Exclusions.*

*To be eligible to receive a Net Monthly Benefit, the Employee must:*

*1. satisfy the Elimination Period with the required days of Total or Partial Disability;*
*2. provide proof of continued Total or Partial Disability; and*
*3. have regular and continuing care by a Physician who provides appropriate treatment by means of examination and testing in accordance with the disabling condition."*

Page 2

*"No LTD Benefit will be payable for any Total or Partial Disability during any of the following periods:*

*3.  any period of Total or Partial Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care.*

*Benefits will be payable for the first 24 months after the Employee completes his Elimination Period.*

*Benefits after the first 24 months will only be payable if the Employee is confined to a Hospital or Institution licensed to provide psychiatric treatment."*

The contract defines the following terms:

*"**Total Disability or Totally Disabled** means the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation."*

*"**Mental Illness** means mental, nervous, psychological, emotional diseases, or behavioral disorders of any type."*

We re-reviewed the information existing in file at the time of the initial claim determination, Mr. Thiffault's letter requesting an appeal (dated October 6, 2002), as well as the additional information you supplied.

The information received in support of this appeal is as follows:

- Your letter dated November 21, 2002; and
- Your letter dated January 9, 2002; and
- An Attending Physician's Statement dated January 3, 2002 by Joseph Grimaldi, Ph.D.; and
- Operations Department Job Description: Director of Distribution and Facilities; and
- Photocopies of prescriptions filled by Fallon Clinic Pharmacy (6); and
- Photocopy of Mr. Thiffault's birth certificate; and
- Photocopy of Mr. Thiffault's military service record; and
- Mr. Thiffault's SSDI application paperwork; and
- Narrative letter from Dr. Grimaldi, dated January 8, 2003; and
- Dr. Grimaldi's curriculum vitae; and
- Photocopy of an informational brochure on polymyalgia rheumatica from the Arthritis Foundation; and

Page 3

- Photocopies of Mr. Thiffault's chart records from the Fallon Clinic, covering the period of 1998-October 16, 2002.

Mr. Thiffault's claim for Long Term Disability benefits was declined on April 15, 2002. The determination was that Mr. Thiffault was not Totally Disabled as defined in the policy contract. Specifically, Mr. Thiffault could not be considered Totally Disabled because he was capable of performing the duties of his own occupation as defined by the policy contract, and because he had surpassed the contractual limitation of 24 months for payment of claims due to a mental illness and was not hospitalized as a result of the mental illness.

This determination was based, in part, on the content of the treatment records supplied by Mr. Thiffault's treating providers at the Fallon Clinic. The information contained in these records indicated that, while he had been diagnosed with and treated for a sleep disorder, this condition was well controlled with treatment. Drs. Trotter and Phadke reported in treatment records from as early as July 1998 that Mr. Thiffault reported that he was "getting a substantial night's sleep" and that "the CPAP treatment eliminated the sleep apnea". Therefore, since Mr. Thiffault's condition was under good control from the treatment he was receiving, there was no support from a medical standpoint that he remained unable to perform the duties of his own occupation. He continued to complain of excessive daytime fatigue and loss of concentration.

Although his medical providers indicated in their treatment records that they did not think these symptoms were a result of sleep apnea, we did not believe we had sufficient information with which to render a final determination on the claim, given Mr. Thiffault's continued complaints. In order for us to more effectively assess the degree, if any, to which these symptoms of fatigue and loss of concentration were impairing Mr. Thiffault, we scheduled an Independent Medical Examination (IME) with David A. Gansler, Ph.D. Dr. Gansler was asked to administer neuropsychological testing to Mr. Thiffault. The results of the examination and testing revealed that the likely source of Mr. Thiffault's daytime fatigue and loss of concentration was a depressive disorder. Following the IME, we received an Attending Physician's Statement from Joseph Grimaldi, Ph.D. that revealed Mr. Thiffault was receiving treatment for a depressive disorder and attention deficit disorder. It was the opinion of the psychiatric consultant, Ronald Pies, MD, that Mr. Thiffault continued to suffer a loss of occupational capacity at that time due to his psychiatric diagnoses. Unfortunately, since Mr. Thiffault had surpassed the contractual limitation of 24 months for psychiatric diagnoses, he was no longer eligible for benefit payments. Consequently, since the medical condition had stabilized and was under control with treatment, and because benefit payments had been extended to Mr. Thiffault well beyond the 24 month limitation for mental disorders, it was found that no further benefits were payable under this claim, and the file was closed.

Page 4

On appeal, you kindly provided the information listed above. These records and documents were referred to James A. Sarni, MD, a board-certified physician specializing in physical medicine and rehabilitation. Dr. Sarni provides consulting services to Sun Life, and did not make the administrative determination on this appeal. Dr. Sarni reviewed both the information provided with the appeal, as well as the medical information contained in the existing claim file.

Dr. Sarni reviewed the medical information that includes an office note dated August 14, 2002 by Andal Govindapichai, MD. This note reports Mr. Thiffault's complaints of generalized body aches with a presumptive diagnosis of postviral syndrome and generalized arthralgias. His sedimentation rate at that time that was slightly outside of normal range. He was reassured that it was postviral and if he was not feeling improved in a couple of weeks, he should contact Dr. Govindapichai's office. There is also an office note by Edward Calkins, MD from August 7, 2002 noting that Mr. Thiffault had complete resolution of the right carpal tunnel syndrome after the release surgery. There was some increasing symptomatology on the left side, which had interfered with Mr. Thiffault's sleep. He also complained of some numbness in the fingers. At that time, Mr. Thiffault apparently gave informed consent for a left carpal tunnel release.

On October 2, 2002, Mr. Thiffault saw Elise Pyun, MD. Dr. Pyun is a rheumatologist and noted the sedimentation rate had now elevated and there were other abnormal findings upon repeat laboratory testing. Dr. Pyun felt that Mr. Thiffault clinically had symptoms consistent with polymyalgia rheumatica (PMR). Dr. Pyun decided to place him on a trial dose of prednisone and if he had a dramatic response, the clinical diagnosis would be supported. On follow-up, on October 16, 2002, that is indeed what occurred. The response to prednisone had been dramatic and consistent with the diagnosis. Mr. Thiffault reported that he "feels great" and that "every symptom has gone away". His physical examination at that time revealed that he had no stiffness or tenderness of any joints, full range of motion of all joints, and no swelling. Mr. Thiffault's occupation falls into the classification of light duty. Dr. Sarni's opinion is that it is reasonable to restrict Mr. Thiffault to a sedentary to light duty occupation, and that there is no reason why an individual with PMR would be unable to perform such an occupation.

We also referred Mr. Thiffault's file to Victor Himber, MD for psychiatric review. Dr. Himber is a board certified psychiatrist, and did not make the administrative determination on this appeal. Dr. Himber reviewed the original claim file and all of the information contained therein, Dr. Grimaldi's narrative and the medical documentation provided with the appeal.

Page 5

Dr. Himber's review indicated that Mr. Thiffault had a long history of psychiatric illness and trouble concentrating. Mr. Thiffault underwent neuropsychological testing as early as October 1998 as a result of these complaints. The testing at that time revealed that Mr. Thiffault had some working memory deficits, but was operating within normal limits overall. He was re-evaluated by Dr. Kent in November 2000 due to continued complaints of memory and concentration problems. The results of this evaluation found "mild difficulty with visual processing speed", but no significant change from earlier testing. Dr. Kent did find significant exacerbation of emotional symptoms, however. This was evidenced in part by the results of the Beck's Anxiety, Depression and Hopelessness inventories – all within the "severe" range. It had been recommended to Mr. Thiffault that he seek more intensive psychotherapy to effectively treat the emotional symptoms he experienced, but he continued seeing Dr. Grimaldi only once every two months over the period of March 2000 to January 2, 2002. At no time did any of the esteemed psychologists who tested Mr. Thiffault find any evidence of Attention Deficit Disorder (ADD), nor was he diagnosed with this condition.

Dr. Himber noted that, additionally, none of Mr. Thiffault's non-psychiatric treatment providers ever documented symptoms of ADD. In the treatment notes from Dr. Pyun, she notes that Mr. Thiffault asked "pointed, relevant questions", and was "very diligent" about taking medication. Drs. Trotter and Calkins similarly do not note any distractibility, loss of focus or trouble concentrating. The only symptoms documented by these physicians is continuing fatigue and malaise. Dr. Phadke, who followed Mr. Thiffault from April 1998 through March 2002, repeatedly noted normal mental status examinations and normal memory testing. He did note that Mr. Thiffault evidenced some depressive symptoms, as did several other providers, but no findings consistent with ADD.

Dr. Himber therefore finds no support for Mr. Thiffault's diagnosis of ADD. He writes, "Dr. Grimaldi's opinion that the 'basis of Mr. Thiffault's vocational incapacity is not his Depressive Disorder or his Sleep Apnea, but rather his Attention Deficit Disorder (ADD) is also simply not supported by the available data." Dr. Grimaldi's assessment that Mr. Thiffault does demonstrate findings consistent with ADD, inattention type, may be accurate; however, even if this diagnosis is accurate, ADD is a lifelong condition and would not be the cause of acute incapacity. Dr. Grimaldi's opinion that "alcohol would camouflage these difficulties," (i.e. ADD symptoms) and that these symptoms became incapacitating following onset of sobriety, is also not supported by the data. Mr. Thiffault ceased alcohol use in 1993 and continued to work for many subsequent years. Following this logic, once Mr. Thiffault discontinued the use of alcohol, the incapacitating symptoms of ADD should have promptly become apparent. This did not occur. Dr. Himber indicates that Dr. Grimaldi's comment that ADD is a result of a neurological dysfunction and not psychological or environmental factors and that Mr. Thiffault's depressive disorder and sleep

Page 6

apnea play no role in his vocational status is "most puzzling". Dr. Himber writes, "The diagnoses assigned to Mr. Thiffault by Dr. Grimaldi are directly from the Diagnostic and Statistical Manual of Psychiatric Illnesses, Fourth Edition (DSM-IV) of the American Psychiatric Association which is a compendium of <u>psychiatric</u> disorders, not neurological disorders. Although there are certainly significant neurological aspects to ADD, environmental and psychological forces play an important role in management of these life-long symptoms as well".

The information provided with the original claim for benefits as well as that provided on appeal indicate that Mr. Thiffault is being treated for polymyalgia rheumatica (PMR), sleep apnea, attention deficit disorder (ADD), and depression. According to the information provided by his own treatment providers as well as the opinions of a specialist in physical medicine and rehabilitation, Mr. Thiffault's diagnoses of PMR and sleep apnea are well controlled with medication and treatment. None of the findings supplied by his medical providers indicate that Mr. Thiffault is limited from performing either sedentary or light activities. Mr. Thiffault's psychologist opines that Mr. Thiffault's vocational limitations stem not from his psychiatric diagnosis of depression, but from ADD (found and described in the American Psychiatric Association's Diagnostic and Statistical Manual of Psychiatric Illnesses, Fourth Edition). He states that ADD is not a psychiatric illness at all, but a neurological one. If this were true, Dr. Grimaldi would not be an appropriate source of treatment for ADD, as he is not a neurologist. Unfortunately, this argument is not valid, since ADD is classified as a psychiatric condition by the American Psychiatric Association and is customarily treated by professionals who specialize in psychology, like Dr. Grimaldi.

Mr. Thiffault's medical conditions do not contribute to limitations that prevent the performance of activities analogous to those performed in his own occupation. The conditions that do limit his ability to perform the duties of his own occupation are psychiatric in nature. The policy contract under which Mr. Thiffault was insured limits benefits payable for mental conditions to a maximum of 24 months, and excludes payment of benefits to individuals who are capable of performing the duties of their own occupations. Consequently, Mr. Thiffault is not eligible for benefit payments, and his claim remains closed.

This concludes our handling of Mr. Thiffault's appeal. All administrative remedies have been exhausted and no additional information will be reviewed. Mr. Thiffault has the right to bring a civil action under the Employee Retirement Income Security Act of 1974(ERISA) 502A.

Page 7

We regret that the determination could not be more favorable. Should you wish to discuss this decision further, you may reach me at 1-800-432-1102 x1693.

Sincerely,

Beth A. Bixler
Sr. Claims Administrator
Group Long Term Disability

cc: file

JS 44
(Rev. 11/95)

# CIVIL COVER SHEET 05 - 40011 FDS

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Victor Thiffeault

**DEFENDANTS**

Easy Manufacturing Company Suburanite
Home of Butler Products, Inc. and
Sun Life Assurance Company of Canada

2005 JAN 20 P 12: 49

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Worcester
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Middlesex
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

KAREN L. STERN, ESQ.,
BERNSTEIN, BURWICK & TUCKER, LLC
10 Mechanic Street, Worcester, MA 01608
(508) 755-5555

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION  (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                                AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

Appeal to District
Judge from
☐ 7 Magistrate
Judgment

## V. NATURE OF SUIT  (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## VI. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

29 U.S.C. Section 1001 et seq---ERISA Claim
Employee's Denial Of Long Term Disability Benefits

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S)  (See Instructions):
IF ANY

JUDGE _____

DOCKET NUMBER _____

DATE  1-19-05

SIGNATURE OF ATTORNEY OF RECORD  *Karen L. Stern*

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)_____

_____

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LIST
ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1))

—      I.      160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT

—      II.     195, 368, 400, 440, 441-444, 540, 550, 625, 710, 720,730,
               740, 790, 791, 820, 830, 840, 850, 890, 892-894, 895, 950.

—      III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

—      IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
               690, 810, 861-865, 870, 871, 875, 900.

—      V.      150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E))

_____

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN
FILED IN THIS COURT? _____

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS
AFFECTING THE PUBLIC INTEREST? _____
IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY? (SEE 28 USC 2403)
_____

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES
PURSUANT TO TITLE 28 USC 2284? _____

7. DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF
MASSACHUSETTS (WORCESTER COUNTY)? (SEE LOCAL RULE 40.1(C)) YES _____ OR IN THE WESTERN
SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? (SEE LOCAL RULE 40.1(D))
YES _____

8. DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN
SECTIONS OF THE DISTRICT? YES _____
(a)    IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE? _____

9. IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE? _____

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY
GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE
IN THE CENTRAL SECTION_____OR WESTERN SECTION_____

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   KAREN L. STERN, ESQUIRE

ADDRESS   10 Mechanic Street, Worcester, MA 01608

TELEPHONE NO.   (508) 755-5555

OVER_SHT-08/98)