UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VICTOR THIFFAULT,<br>     Plaintiff<br><br>V.<br><br>SUN LIFE ASSURANCE COMPANY OF CANADA<br>     Defendant | CIVIL ACTION NO. 05-40011-FDS |

**MEMORANDUM IN SUPPORT OF SUN LIFE ASSURANCE<br>COMPANY OF CANADA'S MOTION FOR SUMMARY JUDGMENT**

**NATURE AND STATUS OF PROCEEDINGS**

In this case, the plaintiff, Victor Thiffault ("Mr. Thiffault"), seeks to recover payment of long-term disability benefits under an employee welfare benefit plan ("the Plan"), provided by his employer, Easy Day Manufacturing Company Suburbanite Home of Butler Home Products, Inc. ("Easy Day"), and funded by a group insurance policy ("the Policy") issued by Sun Life Assurance Company of Canada ("Sun Life"). Both parties agree this case is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 et. seq.

In October 1998, Mr. Thiffault filed a claim for long-term disability benefits due to sleep apnea. However, while investigating his claim, Sun Life determined that Mr. Thiffault was unable to perform the duties of his occupation as the result of a mental illness. Thereafter, Sun Life paid Mr. Thiffault the maximum benefits available under the Policy for disabilities caused by a Mental Illness. Sun Life then informed Mr. Thiffault that he was not entitled to further benefits because (1) he was not confined in a Hospital of Institution licensed to provide psychiatric treatment; and (2) he had failed to prove that he was totally disabled due to a physical condition. After reviewing the additional documentation submitted by Mr. Thiffault on appeal

and referring his entire file for further medical and psychiatric review, Sun Life upheld its decision on appeal.

Having exhausted his administrative remedies, Mr. Thiffault then filed this action, claiming that Sun Life's denial of his claim for LTD benefits violated ERISA. The parties have filed an agreed upon Administrative Record with the Court. Because a review of the Administrative Record reveals that Sun Life's decision in Mr. Thiffault's claim for benefits was not arbitrary and capricious, Sun Life has moved for summary judgment on Mr. Thiffault's claim under ERISA.[1] Sun Life submits this Memorandum, the Statement of Undisputed Facts, and the Administrative Record ("AR") in support of its Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED FACTS

Sun Life incorporates by this reference its Statement of Undisputed Facts, prepared pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 and filed contemporaneously with this Memorandum.

## ARGUMENT

I.  STANDARD OF REVIEW

   A.  The Plan Grants Sun Life Discretionary Authority.

The arbitrary and capricious standard of review applies to Sun Life's decision on Mr. Thiffault's claim under the Plan.[2] "The Supreme Court has held that a denial of benefits under 29 U.S.C. §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or

---

[1] "[I]n an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue. This means the non-moving party is not entitled to the usual inferences in its favor. When there is no dispute over plan interpretation, the use of summary judgment in this way is proper regardless of whether our review of the ERISA decision maker's decision is de novo or deferential." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005)(internal citation omitted).

[2] Mr. Thiffault does not appear to dispute that the arbitrary and capricious standard of review applies. See Plaintiff's Complaint at ¶13.

to construe the terms of the Plan.'" Orndorf v. Paul Revere Life Ins. Co., 404 F.3d at 516, *quoting* Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114 (1989). The question, therefore, is whether the Plan grants Sun Life discretionary authority.

An ERISA plan need not contain the words "discretion" or employ certain "magic words" or a particular linguistic template in order to endow an administrator with discretionary authority. Wildbur v. Arco Chemical Co., 974 F.2d 631, 637 (5th Cir. 1992) (no "magic words" required to trigger deferential standard of review); Kiley v. Travelers Indemnity Co. of Rhode Island, 853 F. Supp. 6, 10 (D. Mass. 1994); McLain v. Metropolitan Life Ins. Co., 820 F. Supp. 169, 174 (D. N.J. 1993). Instead, it need only appear on the face of the Plan documents that the fiduciary has been "given the power to construe disputed or doubtful terms" or to resolve disputes over benefits eligibility. Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 583 (1st Cir. 1993).

The Plan provides Sun Life with the discretionary authority to determine benefit eligibility. Specifically, the Plan provides that in order to receive long-term disability benefits proof of claim must be given to Sun Life. The Plan further provides that "proof must be satisfactory to Sun Life." (AR-0180). Although the First Circuit has not specifically addressed whether this language is sufficient to convey the requisite discretion to Sun Life, in Brigham v. Sun Life of Canada, 317 F.3d 72, 82 (1st Cir. 2003), the First Circuit indicated that, if called upon to do so, it would follow the "widespread acceptance of the view that [this language] triggers discretionary review."

The District Courts in Massachusetts have held that plan language requiring that evidence of proof be "satisfactory to us" conveys the requisite discretionary authority to warrant review of a benefits decision under an arbitrary and capricious standard. *See* Depardo v. MFS/Sun Life Fina. Distr. Inc., 2005 U.S. Dist. LEXIS 9777, *13 (D. Mass. 2005) ("Must be satisfactory to Sun Life" is language sufficient to confer discretionary authority on the plan administrator.);

Brigham v. Sun Life of Canada, 183 F. Supp. 2d 427, 435 (D. Mass. 2002)(the phrase "satisfactory to us" clearly grants to Sun Life discretionary authority over eligibility decisions.); Metropolitan Life Ins. Co. v. Socia, 16 F. Supp. 2d 66, 69 (D. Mass. 1998)("all proof must be satisfactory to us" sufficient to convey discretionary authority.); Miller v. Wang Laboratories, Inc., 998 F. Supp. 78, 80 (D. Mass. 1998)(Plan language requiring that proof of claim be "satisfactory to us" conferred necessary discretion to require that the Court review the denial of benefits under the arbitrary and capricious standard); Guarino v. Metropolitan Life Ins. Co., 915 F. Supp. 435, 444 (D. Mass. 1995)(Plan language requiring that "all proof of claim must be satisfactory to the Insurance Company" granted sufficient discretionary authority to warrant the arbitrary and capricious standard of review).

Therefore, the Plan gives Sun Life sufficient discretionary authority to warrant application of the arbitrary and capricious standard of review.

> B.  Sun Life's Decision To Deny Benefits Must Be Upheld
>     Unless It Is Found To Be Arbitrary and Capricious.

"When a Plan Administrator has discretion to determine an applicant's eligibility for benefits, such as here, the administrator's decision must be upheld 'unless arbitrary, capricious, or an abuse of discretion.'" Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 29-30 (1st Cir. 2001), *quoting* Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 183 (1st Cir. 1998). The "arbitrary and capricious" standard is the "least demanding form of judicial review" and requires only that determinations be "rational in light of the plan's provisions" as well as "reasonable" with "no abuse of discretion." Guarino, 915 F. Supp. at 444, *citing* Perry v. United Food & Commercial Workers District Unions 405 and 442, 64 F.3d 238, 242 (6th Cir. 1995) and Firestone, 489 U.S. at 111. "This standard means that the administrator's decision will be upheld if it is reasoned and 'supported by substantial evidence in the record.'" Vlass, 244 F.3d at 30, *quoting* Doyle, 144 F.3d at 184. "Evidence is 'substantial' if it is reasonably sufficient to

support a conclusion." Id. "Moreover, the existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary." Id. (reversing grant of summary judgment to plaintiff where, on conflicting evidence, plan administrator's decision to discontinue total disability benefits could not be said to be arbitrary and capricious).

The Court's role is limited to determining whether the fiduciary's interpretation was made rationally and in good faith, not whether it was right. Brigham, 317 F.3d at 85; Guy v. Southeastern Iron Workers' Welfare Fund, 877 F.2d 37, 39 (11th Cir. 1989). The decision should be upheld even if the Court disagrees with it so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan. Moats v. United Mine Wkrs. Of America, 981 F.2d 685, 688 (3rd Cir. 1992). Any questions of judgment are left to the administrator. Pokratz v. Jones Diary Farm, 771 F.2d 206, 209 (7th Cir. 1985). An ERISA plan's trustee's decision to deny benefits will be deemed an abuse of discretion only if it is extremely imprudent or extremely unreasonable. Lickteig v. Business Men's Assur. Co. of America, 61 F.3d 579, 583 (8th Cir. 1995).

Thus, Sun Life's decision on Mr. Thiffault's LTD claim will be reversed only if the "eligibility determination was unreasonable in light of the information available to" Sun Life. Cook v. Liberty Life Assurance Co., 320 F. 3d 11, 19 (1st Cir. 2003).

II.     MR. THIFFAULT CANNOT PREVAIL ON HIS LONG-TERM DISABILITY CLAIM.

To prevail on his long-term disability claim, Mr. Thiffault must demonstrate, based on the evidence in the Administrative Record, that: (1) Sun Life's decision that he was not disabled as defined by the Plan after March 31, 2002, was arbitrary and capricious; and (2) because of an Injury or Sickness, he is unable to perform all of the material and substantial duties of his own occupation. (AR-0151). The burden of proof is on Mr. Thiffault. *See* Orndorf, 404 F.3d at 519; Brigham, 317 F.3d at 84-85; Terry v. Bayer, 145 F.3d 28, 34 (1st Cir. 1998). Mr. Thiffault cannot clear these hurdles.

>   A.  Sun Life's Decision That Mr. Thiffault Was Not Totally Disabled Under The Terms Of The Plan After March 31, 2002, Was Reasonable And Supported By Substantial <u>Evidence in the Administrative Record.</u>

At the time Mr. Thiffault submitted his claim for long term disability benefits in October 1998, he was the Director of Distribution and Facilities at Easy Day. (AR-0717-18). His job description reflects that his occupation was sedentary and largely involved managing, supervising and communicating. (AR-0647-49). He claimed to be disabled due to sleep apnea, which caused him to fall asleep at work. (AR-0117-18). On his first Attending Physician Statement ("APS"), his primary care physician, Dr. Trotter, indicated that his diagnoses were depression, sleep apnea and periodic movement of sleep. (AR-0121).

Under the terms of the Policy, Mr. Thiffault, a Director, is considered totally disabled "if because of Injury or Sickness he is unable to perform all of the material and substantial duties of his own occupation." (AR-0151). "Injury" is defined as "bodily impairment resulting directly from an accident and independently of all other causes." (AR-0145). "Sickness" is defined as "illness, disease or pregnancy." (AR-0145). Total disability benefits are also available to Mr. Thiffault under the Policy if he is disabled "due to Mental Illness." (AR-0168-69). "Mental Illness means mental, nervous, psychological, emotional diseases, or behavioral disorders of any type." (AR-0149). Under the Policy, benefits for Mental Illness are payable for 24 months. Thereafter, in order to receive benefits for Mental Illness, the insured must be confined in a hospital or institution licensed to provide psychiatric treatment. (AR-0168-69).

In January 1999, Alice Cluette, R.N., a nurse medical consultant for Sun Life, reviewed Mr. Thiffault's medical records and found his sleep apnea appeared to be well controlled with the CPAP that had been prescribed for him and the change in his medications. His medical records indicated that he claims to have restorative sleep. Nurse Cluette noted that Mr. Thiffault's complaints of periodic limb movements during sleep would not preclude him from

performing his own occupation. However, she found that the records indicated he had psychiatric issues that needed to be addressed. (AR-0372-73). Nurse Cluette's findings were supported by the February 15, 1999, note of Mr. Thiffault's treating physician, Dr. Phadke, Chief of Neurology and Director of Sleep Disorder Center. Dr. Phadke believed that Mr. Thiffault's "cognitive symptoms in the daytime and the excessive fatigue and reduced mental energy are much more likely to be principally related to depression." (AR-0729-30). Mr. Thiffault had a long history of depression and anxiety. (*See e.g.* AR-0480).

In March 1999, at the request of Sun Life, Dr. Ronald Pies, a board certified psychiatrist, reviewed Mr. Thiffault's records and evaluated his claim. Dr. Pies found insufficient objective data to show that Mr. Thiffault's sleep disorder is of such severity to be vocationally incapacitating and his depressive disorder appears to be chronic, and not evidently worse. Dr. Pies recommended that Sun Life have Mr. Thiffault undergo neuropsychiatric testing to assess his cognitive function and his ability to maintain work/alertness. (AR-0137).

Shortly thereafter, at Sun Life's request, a second physician, Dr. Hatti Tsai who is board certified internal medicine, reviewed Mr. Thiffault's records. Dr. Tsai also concluded that there was no evidence to support restrictions and limitations that would preclude Mr. Thiffault from returning to work at his own occupation. Dr. Tsai agreed with Dr. Pies' recommendation for neuropsychological testing. (AR-0134-35).

Based on the recommendations of Drs. Pies and Tsai and as part of its full and fair investigation, Sun Life arranged for Mr. Thiffault to undergo a neuropsychological independent medical examination. (AR-0095-96). In April 1999, Dr. David Gansler, PhD performed a neuropsychological evaluation of Mr. Thiffault and prepared a detailed report of his extensive testing, findings and recommendations. (AR-0087-93). Dr. Gansler's conclusions included that Mr. Thiffault's Axis I diagnoses were "Generalized Anxiety Disorder with Panic Attacks, Major Depressive Disorder Recurrent, and Alcohol abuse (in remission)." He had no Axis II diagnosis.

His Axis III diagnosis was "sleep apnea and periodic limb movements of sleep (currently controlled by treatment)." (AR-0091-93). Dr. Gansler recommended that Mr. Thiffault's depression be treated with coordinated psychotherapy and psychiatric medications. (AR-0091-93). Notably, Dr. Gansler did not find that Mr. Thiffault suffered from Attention Deficit Disorder or ADD. (AR-0087-93).

Upon receipt of Dr. Gansler's report, Sun Life had it reviewed by a licensed social worker and Dr. Pies, the psychiatrist. In June 1999, Dr. Pies noted that "at present – there is sufficient evidence to establish a substantial degree of vocational incapacity" and recommended that Mr. Thiffault undergo psychotherapy. (AR-0321-22).

Therefore, in July 1999, Sun Life informed Mr. Thiffault that it had approved his claim for benefits, effective November 19, 1998. (AR-0115). In May 2000, Sun Life informed Mr. Thiffault that given his psychiatric diagnosis and that he was not confined to a hospital or institution providing psychiatric care, he will reach the maximum 24-month benefit period on November 18, 2000, and thereafter will no longer be eligible for benefits. (AR-0345).

During the pendency of his claim, Sun Life obtained medical records and statements from Mr. Thiffault's attending physicians ("APS"). Notably, his treating physicians did not report objective findings of any disabling physical Illness or Sickness, as those terms are defined in the Policy. Rather, their reports were consistent with vocationally incapacitating mental illness. For example:

- In July 2000, Drs. Grimaldi and Och completed an APS on which they noted he was receiving psychotherapy and psychiatric medications. They indicated a Class 2 physical impairment (medium manual activity) and a Class 5 mental impairment. (AR-0326-27).
- In August 2000, on an APS, Dr. Phadke noted that Mr. Thiffault's diagnoses were "obstructive sleep apnea, periodic limb movement of sleep, depression, all contributing to excessive daytime sleepiness, poor information processing, impaired attention and recall." He appeared to have cognitive disturbance and was to have a follow up neuropsychological test soon. He had no Physical Limitations and his current DSM-III-R diagnosis was "Depression." (AR-00328-29).

- In November 2000, Dr. Kent performed a neuropsychological re-evaluation of Mr. Thiffault. (AR-0272-80). "[H]e presented as alert and oriented x4. … Comprehension was intact as evidenced by his ability to follow task directions and instructions. … Mood appeared anxious." (AR-0272).

- Dr. Kent noted that Mr. Thiffault told him "that the possibility has been raised that he has Attention Deficit/Hyperactivity Disorder (?Inattentive subtype)." (AR-0272). Dr. Kent administered numerous tests to assess Mr. Thiffault's function levels. He found that Mr. Thiffault's test results were not consistent with a diagnosis of AD/HD. (AR-0275).

- Dr. Kent found that from 1998 to 2000, there was no significant change in cognitive capacities and there has been "a significant exacerbation of emotional symptoms." (AR-0275).

- In December 2000 Dr. Phadke noted "[o]n neurological examination today, he was alert, oriented and gave a fairly detailed account of his cognitive problems." Her assessment included that Mr. Thiffault's "sleep apnea is doing well" and his "restless leg syndrome and periodic leg movements appear to have responded quite strikingly to [medication] at bedtime." (AR-0722-23).

- In June 2001, Mr. Thiffault submitted an APS from his treating psychologist, Dr. Grimaldi. It indicated Mr. Thiffault's diagnoses were depressive disorder, attention deficit disorder and a history of sleep apnea. This is the first time that ADHD appeared on Mr. Thiffault's APS. However, Dr. Grimaldi did not indicate any objective findings. He left the cardiac and physical impairment sections blank and he did not list any physical restrictions or limitations. (AR-0247-48). Dr. Grimaldi's APS of January 2002 was virtually identical to his June 2001 APS. (AR-0238-39).

Mr. Thiffault's records did not indicate evidence of any physical illness or injury that interfered with his abilities to perform his own occupation. Based on the material in his file, Sun Life wrote to Mr. Thiffault on April 15, 2002, informing him that there was no evidence to support a physical inability to perform the material and substantial duties of his own occupation. Sun Life referenced 1) the March 1999 reviews by Drs. Pies and Tsai which indicated that his sleep disorders did not create restrictions and limitations that would preclude him from returning to his own occupation and 2) the January 2002 APS by Dr. Grimaldi, which did not indicate any physical restrictions or limitations. In addition, Sun Life notified Mr. Thiffault that he did not qualify for additional benefits under the Mental Illness provision in the Policy because after receiving benefits for 24 months, he would have to be confined in a hospital or institution, which he was not. Sun Life advised Mr. Thiffault of his right to request a review of the denial decision and invited him to submit additional information in support of his claim. (AR-0065-68).

Thereafter, in November 2002, Sun Life received APSs from Drs. Trotter and Och. (AR-0023-26). Neither provided any information to change Sun Life's determination. Dr. Trotter indicated that Mr. Thiffault's diagnoses were right carpal tunnel syndrome and PMR (polymyalgia rheumatica), <u>which were treated</u>. He indicated that Mr. Thiffault was capable of sedentary activity and had moderate mental limitations. He noted that Mr. Thiffault's <u>physical</u> symptoms should be abating already on steroids. (AR-0023-24). Dr. Och noted that Mr. Thiffault's diagnoses were depression and ADHD. He noted <u>no</u> objective findings, subjective symptoms, or physical limitations. Dr. Och indicated that Mr. Thiffault was prevented from returning to work because of "<u>chronic psychiatric symptoms</u>." (AR-0025-26).

In December 2002, Sun Life informed Mr. Thiffault that based on the records submitted, including the APSs of Drs. Och and Trotter, there was insufficient information to support a physical disability. Rather, any restrictions and/or limitations he suffered from were the result of an ongoing mental illness, i.e., depression. (AR-0055).

In January 2003, Sun Life received materials from Mr. Thiffault's attorney in support of his appeal of the denial of benefits. (AR-00651). However, the medical records she provided largely supported Sun Life's decision to deny Mr. Thiffault further benefits. The records included:

- Dr. Phadke's March 2002 letter that Mr. Thiffault's sleep apnea and periodic movements of sleep <u>were under good control</u>. (AR-0702);
- Dr. Calkins May 2002 note that following his right carpal tunnel release, Mr. Thiffault was <u>doing well</u>. (AR-0697);
- Dr. Pyun's October 2002 note that Mr. Thiffault reported that <u>he "feels great</u> … every symptom has gone away including the morning stiffness, pain, lack of movement … <u>He is sleeping well</u> …" (AR-0671) (emphasis added); and
- Dr. Trotter's November 2002 note that Mr. Thiffault reported "<u>feeling very well</u> now." Dr. Trotter noted "<u>[f]rom a work standpoint, the only thing keeping him out of work now is mental health issues.</u>" (AR-0716) (emphasis added).

Mr. Thiffault also provided the January 8, 2003 letter prepared at his lawyer's request by his psychologist, Dr. Grimaldi. (AR-0035-38). Remarkably, Dr. Grimaldi opined that when Mr. Thiffault stopped drinking in 1993, he went "down hill." (AR-0035-36). He opined that Mr. Thiffault's treating neuropsychologist, Dr. Kent (who had performed neuropsychological testing), "incorrectly interprets the cause [of Mr. Thiffault's difficulty functioning] as emotional (due to depression), rather than neurological." (AR-0037). Dr. Grimaldi also disagreed with the Sun Life denial letter stating that he (Dr. Grimaldi) had not indicated limitations for Mr. Thiffault on his APSs. However, he went on to state that the only applicable limitations to indicate on the form are in the section entitled "Mental."[3] (AR-0036).

Although he had never previously so indicated in Mr. Thiffault's medical records or in the APSs he completed for Sun Life, Dr. Grimaldi *now* stated that "the basis for Mr. Thiffault's vocational incapacity is not his Depressive Disorder or his Sleep Apnea, but rather his Attention Deficit Disorder. This disorder is definitely the result of neurological dysfunction not psychological or environmental factors."[4] (AR-0036)(emphasis added). Mr. Thiffault had never previously informed Sun Life that his sole disabling condition was ADD. Dr. Grimaldi cited to a number of tests that he (a psychologist) administered to Mr. Thiffault in support of his argument that Mr. Thiffault suffers ADD. He stated "there is a high degree of consistency with Mr. Thiffault's symptom profile and the DSM IV (Diagnostic and Statistical Manual of the American Psychiatric Association-version four) criteria for Attention Deficit Disorder, inattentive type." (AR-0036, 38).

---

[3] Dr. Grimaldi indicated that Mr. Thiffault had a Class 4 mental limitation. He previously indicated Mr. Thiffault had a Class 5 mental impairment, (*See e.g.* July 2000 APS (AR-0326-27) and October 2002 APS (AR-0025-26)), but now he stated that "Class 5 is reserved for someone who must live in supervised settings e.g. hospital or group home." (AR-0036).

[4] Despite extensive testing, neither Dr. Kent (Mr. Thiffault's treating psychologist) nor Dr. Gansler (neuropsychology IME) found support for a diagnosis of ADD.

As part of Sun Life's evaluation of Mr. Thiffault's claim on appeal, Dr. James Sarni, a board certified specialist in physical medicine and rehabilitation, reviewed the entire file. Based on his review, Dr. Sarni opined that Mr. Thiffault had a light duty occupation and it is reasonable to restrict him to a sedentary to light duty occupation. (AR-0527). Thereafter, Sun Life sought a psychiatric review of Mr. Thiffault's appeal. (AR-00529-531). At Sun Life's request, Dr. Himber, a board certified psychiatrist reviewed the entire file. Dr. Himber found that there was "no objective data supporting an IPD post 11/11/00…[and]…the contemporaneous progress notes of Dr. Grimaldi do not support an IPD." (AR-0522-23). He also found no support for a diagnosis of ADD. (AR-0521-22).

Dr. Himber disagreed with Dr. Grimaldi's opinion that Mr. Thiffault's ADD was previously masked by his alcoholism and that when he became sober, his ADD re-surfaced. As Dr. Himber noted, Mr. Thiffault ceased drinking in 1993 and worked for many subsequent years without incapacitating symptoms becoming apparent. (AR-0522). He also disagreed with Dr. Grimaldi's opinions "that ADD is a result of neurological dysfunction not psychological or environmental factors …" Dr. Himber noted that Dr. Grimaldi "quotes from the DSM-IV of the American Psychiatric Association which is a compendium of PSYCHIATRIC disorders, not neurological disorders." (AR-0522).

Thereafter, in February 2003, Sun Life informed Mr. Thiffault's counsel of its decision reaffirming its denial of benefits under the terms of the Policy after full and fair review of all information in the file and the additional information provided on appeal. (AR-0014-20). Sun Life's decision was not arbitrary and capricious. In evaluating Mr. Thiffault's claim and rendering its decision, Sun Life obtained medical and psychiatric file reviews by a nurse, a licensed social worker, a board certified internal medicine physician, and a board certified specialist in psychiatric medicine (two times), and sent him for an independent medical examination, all prior to the initial denial. Once the appeal information was received from Mr.

Thiffault and his counsel, Sun Life subjected the entire file to reviews by a board certified specialist in physical medicine and rehabilitation (Dr. Sarni), and a board certified specialist in psychiatric medicine (Dr. Himber). (AR-0014-20).

In summary, all of Mr. Thiffault's treating physicians, as well as Sun Life's reviewing physicians, agreed that Mr. Thiffault's sleep problems, PMR and carpal tunnel syndrome were under control and did not limit Mr. Thiffault from performing the material and substantial duties of his own occupation. Based upon all of the information in the Administrative Record, Sun Life reasonably concluded that as of March 31, 2002, there was insufficient evidence in the Administrative Record that Mr. Thiffault was unable, due to a physical injury or sickness, to perform the material and substantial duties of his occupation. Finally, Mr. Thiffault has been paid more than the Policy limitation of 24 months of benefits for Mental Illness and was not eligible for further benefits for Mental Illness as he was not hospitalized for his mental illness.[5]

        B.      <u>Sun Life Was Not Required To Simply Accept One Of Mr. Thiffault's Treating Physician's Opinions.</u>

Sun Life did not act arbitrarily and capriciously in not deferring to the opinion of Dr. Thiffault's treating psychologist, Dr. Grimaldi. Benefit plan administrators do not need to give special deference to a treating physician's opinions. <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822 (2003). The fact that Sun Life relied on the opinions of its medical consultants to determine that Mr. Thiffault was not totally disabled does not mean that its decision was arbitrary and capricious. <u>Gannon v. Metropolitan Life Insurance Co.</u>, 360 F.3d 211, 214 (1st Cir. 2004)(a non-examining physician's review of a claimant's file is reliable medical evidence); <u>Lopes v. Metropolitan Life Ins. Co.</u>, 332 F.3d 6 (1st Cir. 2003)(reliance on medical consultants opinions justified although contradictory to treating physician); <u>Brigham v. Sun Life of Canada</u>,

---

[5] As a good faith gesture to Mr. Thiffault, Sun Life continued to pay benefits beyond the 24-month period allowed for under the Mental Illness provision while it conducted a full and fair review of his claim and subsequent appeal.

183 F. Supp. 2d 427, 437 (D. Mass. 2002), affirmed 317 F. 3d 73 (1st Cir. 2003)(denial upheld based on medical consultant's opinion); Doyle v. Paul Revere Life Ins. Co., 144 F. 3d 181, 184 (1st Cir. 1998)(although conflicting medical evidence, defendant's denial upheld where it relied on opinions of medical consultants).  While "[p]lan administrators … may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician, ...[the U.S. Supreme Court has held that] courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker, 538 U.S. at 834.

Although Sun Life reached a decision contrary to the opinions of one of Mr. Thiffault's physicians, Sun Life based its decision on substantial evidence in the record, including the opinions of its in-house medical reviewers, and IME and several of Mr. Thiffault's other treating physicians (including his primary care physician, neurologist, psychiatrist and neuropsychologist).  In fact, Dr. Grimaldi's opinion itself is inconsistent in that (1) he suggests ADD is not a mental illness yet cites from the DSM-IV, which is a compendium of psychiatric disorders; and (2) he concedes that Mr. Thiffault's only applicable limitations are found in the APS section entitled "Mental".  As such, the denial was not arbitrary or capricious.  See Brigham, 183 F. Supp. 2d at 437.

       C.      Even If Mr. Thiffault Suffers From ADHD, He Is Not Entitled To Further Benefits Under The Policy Since ADHD Is A Mental Illness and He Has Exhausted The Available Mental Illness Benefits.

Even if Mr. Thiffault suffers from ADHD[6], he is not entitled to further benefits because ADHD is a "Mental Illness" under the terms of the Policy, and Mr. Thiffault, who is not

---

[6] Drs. Kent, Gansler and Himber do not find that Mr. Thiffault suffers from ADHD.  *See* AR-0275, 087-93, and 0522.  And it was not raised until after Sun Life informed him that given his psychiatric diagnosis, his benefits would be limited to 24 months pursuant to the Mental Illness limitation provision in the Policy.

confined in a hospital or institution, has received the maximum benefits available (24 months) under the Mental Illness provision. Mr. Thiffault, with the assistance of his psychologist, Dr. Grimaldi, disputes that ADHD is a Mental Illness, arguing that it is the result of a neurological dysfunction. (AR-0036).

There is no universal method for determining whether a disability falls within the definition of "mental illness" contained in employee benefit plans. The First Circuit and the district courts in Massachusetts have yet to face the issue of how mental illness limitations should be interpreted. However, the district courts in New Hampshire and Maine have done so.

In <u>Pelletier v. Fleet Financial Group, Inc. and Unum Life Insurance Company of America</u>, 2000 U.S. Dist. LEXIS 16456 (D. N.H. 2000), the plaintiff, who suffered from major depressive disorder and opioid dependence, claimed that Unum incorrectly classified his disability as a mental illness as that term was defined by the policy. <u>Id.</u> at 53. Under his policy, benefits for disability "due to mental illness" were limited to 24 months. "Mental illness" was defined as "mental, nervous or emotional diseases or disorders of any type." <u>Id.</u> Pelletier claimed the policy's definition of mental illness was ambiguous. He claimed that his disability had an organic cause.

The court rejected Pelletier's ERISA claim because it did not find the term mental illness, as defined in the policy, to apply only to conditions with no known organic cause. <u>Id.</u> at 16. The court followed the Fifth and Eighth Circuits, which have held that the term mental illness is unambiguous and is properly applied to disorders "typically defined as 'mental,' irrespective of their causes." <u>Id.</u> at 16 <u>citing</u> <u>Tolson v. Avondale Industries, Inc.</u>, 141 F.3d 604, 609-610 (5th Cir. 1998) and <u>Prudential Insurance Company of America v. Doe</u>, 140 F.3d 785, 791 (8th Cir. 1998). The court held that the underlying decision would be rendered meaningless if the term mental illness "were to be read so narrowly as to exclude every mental disorder that may be deemed to have an organic cause.

In 2000, in <u>Hess v. Allstate Insurance Company and MetLife Insurance Company</u>, 2000 U.S. Dist. LEXIS 12258 (D.Me. 2000), the plaintiff was diagnosed with bipolar disorder.  Under the terms of his policy, benefits "due to a mental or nervous disorder" were limited to 24 months.  <u>Id.</u> at 6.  "Mental and nervous disorders were defined as "a mental or emotional disease or disorder of any kind, including but not limited to neurosis, psychoneurosis, psychopathy and psychosis."  <u>Id.</u> at 5.  Hess argued that MetLife had improperly classified his bipolar disorder as mental.  He submitted various medical opinions stating that bipolar disorder is a medical disorder of the brain and therefore should not be defined as a mental or nervous condition.  <u>Id.</u> at 14-15.  His claim was reviewed internally by a number of psychiatric consultants who disagreed with Hess' physicians.

In its denial letter, MetLife relied in part on the fact that bipolar disorder is included, along with other mood disorders, as a mental disorder in DSM-IV.  <u>Id.</u> at 19.  The court found that it was reasonable for MetLife to rely at least in part on the classification of bipolar disorder as a psychiatric disorder in both DSM-IV and the International Classification of Diseases.  <u>Id.</u> at 36.  As a result, the court held that MetLife's decision was not arbitrary or capricious and granted summary judgment in favor of MetLife.

Other federal circuits have examined the term "mental illness" as would a layperson.  They favor a symptom-based approach and have concluded that laypeople are more likely to recognize the symptoms of an illness than to understand its causes.  <u>See, e.g., Lynd v. Reliance Standard Life Ins. Co</u>., 94 F.3d 979, 983-84 (5th Cir. 1996)(insurer properly applied policy "mental or nervous disorder" limitation to insured's disability despite physician testimony that insured's depressive disorder had an underlying physical basis); <u>Brewer v. Lincoln Nat. Life Ins. Co.</u>, 921 F.2d 150, 154 (8th Cir. 1990) ("Laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.").

One pillar of this position is the view that a cause-based definition of mental illness would effectively read out a disability plan's mental illness exception because some physical cause can be identified for any illness.  See, e.g., Lynd, 94 F.3d at 983 n.5 ("In identifying the 'causes' and 'symptoms' of illnesses, it seems that an argument could always be fashioned that the illness itself should be viewed as a 'symptom' of some underlying 'physical' cause; this is particularly true if one is willing to trace the origins of the illness ad infinitum.").  In Lynd, the 5th Circuit also noted that, in addition to laypersons, the American Psychiatric Association classifies "major depressive disorder" as a mental disorder even though its origin may be physical in nature.  Id. at 983.

When an ERISA plans limits disability benefits for mental or nervous disorders "the terms should be accorded their ordinary and not specialized, meanings."  Paulson v. Paul Revere Life Insurance Company, 323 F.Supp. 2d 919, 943-946 (S.D. Iowa 2004).  In Paulson, the court found that applying the common and ordinary meaning as a reasonable person would in the plan administrator's position, the plaintiff suffered from a disability due to a mental illness as that term is ordinarily understood and as it is defined in the disability policy.  As supporting factors, the court also cited the fact that the treatment for the plaintiff's disability was the treatment for depression and that his disability qualified as a "disorder classified as a mental disorder in the diagnostic and statistical manual of mental disorders, which is published by the American Psychiatric Association.  As a result, the court concluded that a lay person, determining whether plaintiff's condition is a mental disorder, would find that it is.  Id. at 945.

In some courts, a plan administrator's reliance on the Diagnostic and Statistical Manual of Mental Disorders (DSM) is an important factor in determining whether a disability is properly classified as a mental illness.  See Lynd, 94 F.3d at 983; Fuller v. J.P. Morgan Chase and Company Benefits Appeal Comm., 2003 U.S. Dist. LEXIS 11359 (E.D.N.Y. July 1, 2003); Paulson, 323 F.Supp.2d at 945; Hess v. Allstate Ins. Co. of Amer., 2000 U.S.Dist. LEXIS 12258

(D.Me. 2000).  For example, in Fuller, the Eastern District of New York upheld a plan administrator's determination that bipolar disorder was a mental disability where the policy gave the administrator the discretion to interpret the terms of the Plan.  Id.  It relied in part on the fact that bipolar disorder is listed in the Diagnostic and Statistical Manual of Mental Disorders IV, published by the American Psychiatric Association (DSM-IV).  Id. at *3.

In her appeal, Fuller emphasized the physical nature of bipolar disorder and submitted affidavits of medical experts who contended that she suffered from a physical disability.  One stated, "the causes of bipolar disorder are rooted in the complex biochemical processes that occur within the human brain … [and] would therefore properly be classified as 'physical' rather than 'mental or nervous' condition."  The plaintiff's treating doctor opined that she suffered from "bipolar disorder which is a chemical imbalance – a medical and physical illness of the brain … ."  Id. at *4.

The District Court could not conclude that the plan administrator acted in an arbitrary and capricious manner in labeling bipolar disorder a mental disability.  Although "mental disability" was not defined in the Plan, the plan administrator resolved any ambiguity about the meaning of the term by relying on the DSM-IV, the American Psychiatric Association's Compendium of Mental Disorders.  Id. at *7-8.

Some courts consider the method of treatment in determining whether an illness is mental or physical. Illnesses treated by psychiatrists employing psychotherapy and psychotropic medication have been considered to be mental illnesses. See, e.g., Blake v. Unionmutual Stock Life Ins. Co., 906 F.2d 1525, 1530 (11th Cir. 1990) (noting that the plaintiff's postpartum depression was properly considered a mental illness because "she was treated primarily by psychiatrists receiving well recognized psychiatric treatment, including individual psychotherapy, psychoactive drug therapy, electroconvulsive therapy and participation in group sessions."); see also Paulson, 323 F.Supp.2d at 943-46 (discussed above); Simons v. Blue Cross

& Blue Shield of Greater New York, 144 A.D.2d 28, 536 N.Y.S.2d 431, 434 (N.Y. Sup. Ct. 1989) (finding that coverage for the plaintiff's hospitalization for anorexia nervosa was not excluded by the insurance contract's mental illness limitation because the patient received treatment for the physical problems from anorexia--malnutrition and hypotension--even though anorexia could be considered a psychiatric condition).

In the present case, the evidence in the administrative record, including the opinions of two board certified psychiatrists, a treating neurologist, a treating psychologist and the detailed results of a neuropsychology IME, establishes that a chronic mental illness, not ADHD, was the cause of Thiffault's disability. However, even if ADHD was the cause of his disability, under all of these analyses, there can be no question that Sun Life did not act in an arbitrary and capricious manner in finding that ADHD is a Mental Illness, and not an Illness or Injury, as those terms are defined by the Policy. First, consistent with the determinations of the courts in Pelletier, supra, Lynde, supra, and Brewer, supra, ADHD is predominantly recognized as a mental illness and Sun Life was reasonable in making that same determination. Laypersons recognize that ADD is a mental illness. That is the common and ordinary meaning ascribed to it by reasonable people.

Second, consistent with the determinations of the courts in Hess, supra, Lynde, supra, and Fuller, supra, since ADHD is classified in the DSM (the prevailing professional criteria for diagnosis of mental conditions) as a mental illness, Sun Life was reasonable to find it was. As Dr. Himber noted in his review, Dr. Grimaldi "quotes from the DSM-IV of the American Psychiatric Association which is a compendium of PSYCHIATRIC disorders, not neurological disorders." (AR-0522). Even Dr. Grimaldi, who argues that Mr. Thiffault's ADHD is not a mental illness, stated that the only applicable limitations for Mr. Thiffault on the APS form were in the section entitled "Mental." (AR-0036).

Finally, consistent with the courts determinations in Blake, supra, Paulson, supra, and Simons, supra, the treatment providers and methods of treatment for ADHD are mental health

providers and Sun Life was reasonable therefore to find that Mr. Thiffault suffered from a mental illness. It is Dr. Grimaldi, a psychologist, and Dr. Och, a psychiatrist, who are treating Mr. Thiffault regularly for his alleged ADHD. Dr. Phadke, his neurologist, is not doing so. As Sun Life noted in its denial letter, if Dr. Grimaldi was correct in his opinion that ADD "is not a psychiatric illness at all, but a neurological one" then he "would not be an appropriate sources of treatment for ADD, as he is not a neurologist." (AR-0017-19).

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Sun Life's decision to deny benefits after March 31, 2002, was reasonable and supported by the substantial evidence in the Administrative Record. Sun Life requests that this Court enter summary judgment on its behalf.

SUN LIFE ASSURANCE COMPANY OF CANADA

By its attorneys,

/s/ Elizabeth L. B. Greene
Joan O. Vorster, Esq., BBO #550375
Elizabeth L. B. Greene, Esq., BBO #561456
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608-1477
Ph: (508) 791-8500; Fax: (508) 791-8502

Dated: July 21, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 28, 2006.

/s/ Elizabeth L. B. Greene

Dated: July 21, 2006