UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VICTOR THIFFAULT,<br>     Plaintiff<br><br>V.<br><br>SUN LIFE ASSURANCE COMPANY OF CANADA<br>     Defendant | CIVIL ACTION NO. 05-40011-FDS |

**SUN LIFE ASSURANCE COMPANY OF CANADA'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

In support of its Motion for Summary Judgment and pursuant to Local Rule 56.1, the defendant, Sun Life Assurance Company of Canada ("Sun Life"), submits the following concise statement of the material facts of record as to which it contends there is no genuine issue to be tried.

1. Sun Life provided group long-term disability insurance coverage to Mr. Thiffault's employer, Easy Day Manufacturing Company ("Easy Day"), under Group Policy Number 44365 ("the Policy"), which was an employee welfare benefit plan ("the Plan") as defined by ERISA.  (AR-0763-807).

2. Mr. Thiffault was employed by Easy Day as a Director of Distribution and Facilities at the time he filed his claim for total disability benefits under the Policy.  He had worked for Easy Day since 1985.  His last day of work was May 22, 1998.  He stopped working because of "sleep apnea which caused him to fall asleep during the daytime (work)."  (AR-0117-18).

3. The Policy provides a definition for "Total Disability" that applies to directors, managers and supervisors. As the Director of Distribution and Facilities, the definition that applies for Mr. Thiffault is: "Total Disability or Totally Disabled means the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation." (AR-0151).

4. "Injury" means bodily impairment resulting directly from an accident and independently of all other causes. (AR-0145).

5. "Sickness" means illness, disease or pregnancy. (AR-0145).

6. Under the terms of the Policy, benefits payable due to Mental Illness are limited. Specifically, the Policy provides that "No LTD benefit will be payable for any Total … Disability during any of the following periods: …

> any period of Total … Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care.
>
> Benefits will be payable for the first 24 months after the Employee completes his Elimination Period.
>
> Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution licensed to provide psychiatric treatment. (AR-0168-69).

7. "Mental Illness means mental, nervous, psychological, emotional diseases, or behavioral disorders of any type." (AR-0149).

8. Under the terms of the Policy, "Sun Life must receive Notice and Proof of Claim prior to any payment …" (AR-0179). Proof of Claim "must be satisfactory to Sun Life." (AR-0180).

9. In October 1998, Mr. Thiffault completed his part of the Long Term Disability Claim Statement. (AR-0119-120). He certified that:

- He first noticed the symptoms of his illness in 11/97;

- The nature of his illness and its first symptoms were "pain in limbs;"

- He sees Dr. Epstein and Dr. Phadke for his condition. Both of them specialize in "sleep disorder;" and

- He is unable to perform all of the duties of his occupation.

10. On October 19, 1998, Mr. Thiffault's treating primary care physician, Dr. Trotter, completed an APS on which he indicated:

- Mr. Thiffault's symptoms first appeared "prior to 1990" and "recently 11/97;"

- His diagnoses are "Depression / Sleep Apnea / Periodic Mvmts of Sleep;"

- The objective findings to support the diagnoses are: abnormal sleep studies;

- The subjective symptoms are fatigued during day – frequent rest periods, unable to do sustained physical activity; lower extremity aching/leg twitching, chest pain / GI upset / Headaches / Cognitive difficulty;

- The treatment Mr. Thiffault receives is "Psychiatry / Psych Meds / Nasal CPAP;"

- He has improved sleep and does not complain of chest pain, headache or GI;

- He has Class 5 physical and mental impairments;

- His Axis I diagnosis is Depression;

- "Aggressive psychiatric care may improve cognitive ability as well as physical incapacity." (AR-0121-22).

11. On December 20, 1998, at the request of Easy Day, (AR-0400-01), Dr. Epstein, Director, Sleep Medicine Laboratory, wrote to Sun Life. He stated Mr. Thiffault was under his care for significant sleep disorders "… which lead him to experience excessive daytime sleepiness and cause him to be unable to perform the required duties of his current job." (AR-0398).

12. On December 28, 1998, Sun Life agreed to pay benefits to Mr. Thiffault on a good faith basis to avoid hardship for him while it continued to investigate his claim. (AR-

0391). Sun Life sent similar letters to Mr. Thiffault on February 4, 1999 and March 5, 1999. (AR-0354, 0360).

13. In January 1999, Alice Cluette, R.N., a medical consultant for Sun Life, reviewed Mr. Thiffault's records. She found his sleep apnea appeared to be well controlled with the CPAP and change in his mediations; he claims to have restorative sleep; and "his complaints of periodic limb movements most definitely would <u>not</u> preclude him from performing his own occupation. However, he does appear to have psych issues which need to be addressed." (AR-0372-73).

14. Mr. Thiffault had a long history of depression and anxiety for which he treated daily with medications. (*See* e.g. AR-0480, 5/24/95 medical note).

15. On February 15, 1999, Mr. Thiffault saw one of his treating physicians, Dr. Phadke, Chief of Neurology and Director of Sleep Disorder Center at St. Vincent Hospital. On examination he was "quite alert. … He held a very appropriate and rational conversation and did not appear to be overly depressed today." Dr. Phadke noted her belief that "his cognitive symptoms in the daytime and the excessive fatigue and reduced mental energy are much more likely to be principally related to the depression. She noted he had had some recent physical complaints for which no clear underlying basis was found. (AR-0729-30).

16. On March 3, 1999, at the request of Sun Life, Dr. Ronald Pies, a board certified psychiatrist, evaluated Mr. Thiffault's claim from the standpoint of psychiatric incapacity. His impressions included:

- Mr. Thiffault has a sleep disorder that may be contributed to by his psychiatric medications;

- There is insufficient data to show that his sleep disorder is of such severity to be vocationally incapacitating, and there is data to the contrary (Dr. Phadke's note of 4/22/98 stating "he has never been found to be sleeping at work;" Dr. Bobrins' multiple notations that he appears "fully alert");

- There is evidence of subjective cognitive complaints but Dr. Phadke's exam of 9/24/98 found normal memory, digit span, serial 7's;

- The depressive disorder appears to be chronic, at least since 1994, and not evidently worse. (AR-0137).

17. Dr. Pies concluded that there was insufficient objective data to establish vocational incapacity owing to a psychiatric or neuropsychiatric disorder. Dr. Pies made several recommendations, including neuropsychiatric testing to assess cognitive function and ability to maintain work/alertness, and discussing with his attending physician making possible changes to his psychiatric medications. (AR-0137).

18. On March 12, 1999, at the request of Sun Life, Dr. Hatty Tsai, a board certified internal medicine physician, reviewed Mr. Thiffault's records. Dr. Tsai noted that:

- Mr. Thiffault was under treatment for depression, sleep apnea, and periodic limb movement disorder of sleep;

- He has mild obstructive sleep apnea which resolved with CPAP treatment (7/98 note from Dr. Phadke);

- His problem with periodic limb movements that caused fragmented sleep was treated with medication with good results;

- In a 9/98 note, Dr. Trotter, his PCP, stated that Mr. Thiffault was "getting a sustained night's sleep," and complained of increasing fatigue later in this day, which was "not likely to be related to his sleep apnea." (AR-0134).

19. Dr. Tsai concluded that there was no evidence to support restrictions and limitations that would preclude Mr. Thiffault from returning to his own occupation. Dr. Tsai agreed with Dr. Pies' recommendation for neuropsychological testing for cognitive functioning and noted a suspicion that Mr. Thiffault's "complaints of fatigue are related to the depression which has already been diagnosed." (AR-0134-35).

20. Sun Life arranged for Dr. David Gansler, PhD, to perform a neuropsychology independent medical examination of Mr. Thiffault. (AR- 0095-96).

21.  On April 28, 1999, over the course of four hours, Dr. Gansler performed a neuropsychology evaluation of Mr. Thiffault. He prepared a detailed Clinical Neuropsychology Test Report. (AR-0087-93).

22.  From Mr. Thiffault, Dr. Gansler learned the following:

- He had sleep apnea treated by CPAP which he uses and thinks has helped him;

- He is followed by Dr. Och for depression but receives his psychiatric medications through Dr. Bobrin;

- He thinks that he has been bothered by memory and concentration deficits, and word finding difficulty for the last year or two;

- He has had a number of rule out heart attacks following complaints of chest pain;

- He views himself as a recovering alcoholic;

- He understands that his diagnoses are chronic depression and generalized anxiety disorder. (AR-0087-88).

23.  From his review of the complete packet of Mr. Thiffault's medical records provided to him by Sun Life, Dr. Gansler found the following among the most notable portions of the records:

- 2/14/95-10/31/95, Dr. Hughes' psychiatric progress notes indicate that Mr. Thiffault complained of depressed mood and low energy in the mornings; she recommended modifying his psychiatric medications for better relief and encouraged him to enter psychotherapy;

- 9/11/97, Dr. Cavallaro noted that Mr. Thiffault complained of overwhelming need for sleep and dizziness. He recommended psychotherapy services, but Mr. Thiffault declined;

- 10/22/97, Dr. Salva's psychiatric progress note indicates that Mr. Thiffault complained of fatigue and was informed that his fatigue was a manifestation of his underlying anxiety and unresolved conflicts and he was encouraged to get counseling;

- 10/22/97, Dr. Trotter's internal medicine progress note indicates that he examined Mr. Thiffault for complaints of fatigue, ran laboratory tests which were unremarkable, and concluded that his fatigue was best attributed to his depression; and

- 9/24/98, Dr. Phadke's neurology progress note indicates that bedside cognitive examination was unremarkable. (AR-0088-89).

24. Dr. Gansler's behavioral observations of Mr. Thiffault included:

- He was adequately dressed and groomed;

- He appeared fatigued and sad;

- His spontaneous speech was soft-spoken, somewhat slowed, but well-articulated and had normal grammatical complexity;

- His behavior was socially appropriate and cooperative; and

- He remained awake and alert throughout the evaluation, which took place between 10:00 a.m. and 2:00 p.m. (AR-0089-90).

25. Dr. Gansler administered several tests to evaluate Mr. Thiffault's general intellectual functioning; attention and executive system functioning; language functioning and academic achievement; sensory, visuo-motor and visuo-spatial functioning; learning and memory functioning; and psychological self report. On the vast majority of these tests, Mr. Thiffault performed "average" or "within expectations." (AR-0090-91).

26. On the psychological self-report test, Dr. Gansler found that Mr. Thiffault endorsed a number of symptoms of clinical depression including sadness, guilt (over not working and sleeping too much), anhedonia, worry and somatic pre-occupation. (AR-0091).

27. Dr. Gansler administered one test as a psychological self-report of psychopathology. He noted validity indicators suggest Mr. Thiffault responded in an honest and straightforward fashion. He also noted that the "profile is indicative of the presence of serious and chronic psychopathology. … Individuals who respond in this fashion are often diagnosed with anxiety and depressive disorders. … Such individuals are also pervasively sad, hopeless, and have low self-esteem … often are not alert and have trouble thinking coherently …" (AR-0091).

28. Dr. Gansler's conclusions and recommendations included:

- It is very likely Mr. Thiffault suffered a circumscribed decline in his mental capacities at some point between two and approximately thirteen years in the past;

- This decline is super-imposed on a more chronic course of depression that began in early adulthood;

- Mr. Thiffault responded slowly at times and appeared fatigued (presumably neurovegetative symptoms of depression) but he was awake and alert throughout the four hour interview and test administration process;

- His neuropsychological test results were all within normal limits;

- There is evidence of mild to moderate cognitive dysfunction and indications of memory deficits;

- He presents with chronic and serious psychopathology;

- His present capacity for adaptive functioning is quite limited due to the combination of psychopathology and cognitive deficit;

- He has indications of hypochondria, having presented with a number of medical symptoms that have not been verified after detailed medical examinations;

- He acknowledges pre-occupation with his physical health despite the fact that his most serious medical problem (sleep apnea) has been properly diagnosed and treated;

- His Multi-axial DSM-IV Diagnosis is:

    o Axis I: Generalized Anxiety Disorder with Panic Attacks; Major Depressive Disorder Recurrent; and Alcohol abuse (in remission)

    o Axis II: none specified

    o Axis III: sleep apnea and periodic limb movements of sleep (currently controlled by treatment)

    o Axis IV: occupational problems

    o Axis V: GAF=45.

- The standard optimal level of care for depression treatment is combined and coordinated delivery of pharmacotherapy with psychotherapy; and

- Mr. Thiffault's treatment could be augmented by the addition of psychotherapy provided in a coordinated fashion with his pharmacotherapy, along with

adjustment of his pharmacotherapy to minimize side effects of fatigue and memory deficit.  (AR-0091-93).

29. Nowhere in Dr. Gansler's detailed report is there mention of Mr. Thiffault having ADD or ADHD.  Mr. Thiffault did not report ADD or ADHD as part of his history.  Nor did Dr. Gansler find it as part of his thorough examination and testing.  Although he made many findings and several diagnoses, Dr. Gansler did not find Mr. Thiffault to have ADD or ADHD.

30. Upon Sun Life's receipt of Dr. Gansler's IME report, Shelly Pratt, MSW, LICSW, ASWCM, reviewed the information provided and requested Dr. Pies to do so.  (AR-00321).

31. In June 1999, at Sun Life's request, Dr. Pies reviewed and commented on Dr. Gansler's IME report.  (AR-0321-22).  Dr. Pies noted that "given the GAF score of 45 and Dr. Gansler's overall impressions, I believe that – at present – there is sufficient evidence to establish a substantial degree of vocational incapacity.  However, this does not necessarily mean that claimant has reached highest possible level of function, or that he will never be able to return to work."  (AR-00321-22).

32. Dr. Pies noted that "[i]t appears he has not been regularly engaged in ongoing individual psychotherapy, which, in my view, indicates that treatment has not been entirely appropriate for condition. … I recommend we re-examine this case after appropriate and vigorous treatments have been administered."  (AR-0322).

33. On July 12, 1999, Sun Life informed Mr. Thiffault that it had approved his claim for LTD benefits under the Policy, effective November 19, 1998.  (AR-0115).

34. On May 8, 2000, Sun Life informed Mr. Thiffault that given his psychiatric diagnosis, his benefits will end on November 18, 2000, because the Policy provides benefits for

24 months for psychiatric conditions, unless he is confined to a hospital or institution licensed to provide psychiatric care. (AR-0345).

35. On July 21, 2000, Drs. Grimaldi and Och completed one APS. (AR-0326-27). They indicated that Mr. Thiffault was receiving psychotherapy and medications. For progress they noted he had improved. They left the Cardiac section blank and noted a Class 2 (medium manual activity) impairment for Physical. For Mental Impairment, they noted Class 5 and wrote "unable to cope with anything." (AR-0326-27).

36. On August 30, 2000, Dr. Phadke completed an APS. She noted that Mr. Thiffault's diagnosis was "obstructive sleep apnea, periodic limb movement of sleep, depression, all contributing to excessive daytime sleepiness, poor information processing, impaired attention and recall." She noted that he appeared to have cognitive disturbance and was to have a follow up neuropsychological test soon. She indicated that Cardiac and Physical Limitations were "N/A" and that she did not know what his mental impairment was or what his limitations were. She noted his current DSM-III-R diagnosis to be "Depression." (AR-00328-29).

37. In November 2000, Dr. Kent, a licensed psychologist and clinical neuropsychologist, wrote to Dr. Phadke about his reevaluation of Mr. Thiffault, whom he had previously evaluated in October 1998 for cognitive complaints of word finding difficulties and diminished memory. (AR-0272-80). At Sun Life's request, Mrs. Thiffault sent Dr. Kent's report to Sun Life. (AR-0271).

38. Dr. Kent reevaluated Mr. Thiffault in 2000 over the course of two sessions (one 3 hour and one 4 hour). "On both occasions he presented as alert and oriented x4. … Comprehension was intact as evidenced by his ability to follow task directions and instructions. … Mood appeared anxious." (AR-0272).

39. Dr. Kent noted relevant history, which included: treatment with Dr. Och (psychiatry) and Dr. Grimaldi (psychology); "that the possibility has been raised that he has Attention Deficit/Hyperactivity Disorder (?Inattentive subtype);" and that "consideration has been given to a diagnosis of atypical dementia." (AR-0272).

40. Dr. Kent administered numerous tests to assess Mr. Thiffault's function levels. His findings included:

- "[T]he measures of emotional/behavioral functioning revealed prominent symptoms of anxiety and depression." The tests revealed scores that were "in the 'severe' range."

- There was a "prominence of depressive feelings. Findings were indicative of feelings of hopelessness, guilt, and diminished self-esteem. Additionally, the findings were indicative of an underlying irritability/agitation, along with vague complaints of physical discomfort."

- He scored "below those typically endorsed by adults diagnosed with AD/HD, and was more in line with scores obtained by depressed patients or non-psychiatric individuals." (AR-0275).

41. Based on the testing, Dr. Kent's impressions included:

- From 1998 to 2000, there was no significant change in cognitive capacities;

- Both sets of data showed "unimpaired findings in the areas of brief attention, verbal memory, language, visual, intellectual, and executive. Additionally, both sets of data were suggestive of mild difficulties with visual speed of processing and a mild relative difficulty with visual memory…"; and

- There has been "a significant exacerbation of emotional symptoms." (AR-0275).

42. Dr. Grimaldi's APS of June 2001, indicated that Mr. Thiffault's diagnoses were depressive disorder, attention deficit disorder and a history of sleep apnea. He indicated no objective findings. He indicated the following subjective symptoms: poor stress tolerance, depressed mood, inability to focus or organize multi-step problems. He indicated that he has treated Mr. Thiffault monthly since 1996. His treatment is cognitive-behavior therapy and psychiatric medications. Mr. Thiffault's progress is unchanged and "treatment is maintenance –

will not improve, but can worsen." He left the cardiac and physical impairment sections blank and did not list any physical restrictions or limitations. He noted a Class 4 Mental impairment. (AR-0247-48).

43.    Dr. Grimaldi's APS of January 2002 was virtually identical to his June 2001 APS. (AR-0238-39).

44.    On April 15, 2002, Sun Life wrote to Mr. Thiffault informing him that based on the material currently in his file, there was no evidence to support his physical inability to perform the material and substantial duties of his own occupation. Sun Life referenced 1) the March 1999 reviews by Drs. Pies and Tsai where they indicated that his sleep disorders did not create restrictions and limitations that would preclude Mr. Thiffault from returning to his own occupation and 2) the January 2002 APS by Dr. Grimaldi, which did not indicate any physical restrictions or limitations. In addition, he did not qualify for additional psychiatric benefits because under the Policy, in order to qualify for benefits for a psychiatric condition after 24 months of payment of benefits, he would have to be confined in a hospital, which he was not. Sun Life invited Mr. Thiffault to submit comments, documents, records or information in response and informed him of his right to request a review of the denial decision. (AR-0065-68).

45.    On October 6, 2002, Mr. Thiffault wrote a cogent and detailed letter to Sun Life requesting a review of its decision to close his LTD claim. He stated that "[b]oth the disorders of sleep apnea and Attention Deficit Disorder are organic in nature and can be referenced in physical conditions, thereby eliminating the mental illness reasoning of your claim closure." He also referenced his carpal tunnel syndrome, his pains in his extremities and his rheumatologist, Dr. Pyun's consideration of a diagnosis of polymyalgia rheumatica ("PMR"). He stated that "[t]he fatigue and need for frequent naps, the inability to focus for long periods of time, the

weakness, stiffness and pain in [his] limbs/joints each prohibit [him] from performing all of the material and substantial duties of [his] occupation." (AR-0757-58). He enclosed only his job description. (AR-0647-49).

46. After his October 6, 2002 appeal letter, Mr. Thiffault submitted two APSs to Sun Life, which it received in early November 2002. One was from Dr. Trotter, his PCP, and the other was from Dr. Och, his psychiatrist. (AR-0023-26).

47. Dr. Trotter's APS of October 24, 2002, indicated that Mr. Thiffault's diagnoses were right carpal tunnel syndrome and polymyalgia rheumatica ("PMR"). For treatment he noted only right carpal tunnel release and prednisone for PMR. He noted that Mr. Thiffault had improved. He left the section entitled "Cardiac (If Applicable)" entirely blank. He indicated that Mr. Thiffault had a Class 4 physical impairment – "moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity." Mr. Thiffault had a Class 3 mental impairment – "moderate limitations." In a normal day, Mr. Thiffault could stand/walk for 1-4 hours, sit for 1-3 hours, drive for 1-3 hours and lift 25 pounds. His comments in the Remarks section included that recent treatment with Prednisone for new diagnosis of PMR "seems to be helping significantly. Physical limitations should be abating already on steroids…" (AR-0023-24).

48. Dr. Och's APS of October 27, 2002, indicated that Mr. Thiffault's diagnoses were depression and ADHD. He left blank the sections for objective findings and subjective symptoms. He indicated that he was treating Mr. Thiffault monthly. For progress he indicated that Mr. Thiffault had improved. He left blank the sections on cardiac and physical capacities. He indicated that Mr. Thiffault had a Class 5 mental impairment and was prevented from returning to work in any occupation because of "chronic psychiatric symptoms." (AR-0025-26).

49. On December 12, 2002, Sun Life informed Mr. Thiffault " … it appears that your claim is no longer for physical issues but for depression." Sun Life asked Mr. Thiffault to submit records from his treating psychiatrist and counselors and informed him that if he did not, Sun Life would assume he no longer wished to pursue his claim. (AR-0055).

50. On January 13, 2003, Sun Life received records from Mr. Thiffault's attorney in support of his appeal request, including the report of Dr. Grimaldi, and many pages of medical records. (AR-0651). Sun Life's plan was to seek a medical review of the materials first and then a psychiatric review to assist in evaluating the appeal. (AR-0505).

51. The medical records Sun Life received from Mr. Thiffault's attorney included:

- An April 4, 2000, letter from Dr. Phadke to Dr. Trotter about Mr. Thiffault's visit. On examination, "he seemed quite alert …" Dr. Phadke's assessment was that his sleep apnea was doing well and his periodic limb movements were better overall. (AR- 0727-28).

- A December 13, 2000, letter from Dr. Phadke to Dr. Trotter about her examination of Mr. Thiffault. "On neurological examination today, he was alert, oriented and gave a fairly detailed account of his cognitive problems. … the recent neuropsychological testing performed by Dr. Kent … did not show any evidence of cognitive decline during the interval over which this test was performed (over a year)." Dr. Phadke's assessment included that Mr. Thiffault's "sleep apnea is doing well" and his "restless leg syndrome and periodic leg movements appear to have responded quite strikingly to [medication] at bedtime." (AR-0722-23).

- A March 2002 letter from Dr. Phadke to Dr. Trotter about her examination of Mr. Thiffault. She noted his sleep apnea and periodic movements of sleep were under good control. On examination "he was alert, oriented and gave a lucid account of his history." (AR-0702).

- A May 2002 note from Mr. Thiffault's surgeon, Dr. Calkins, about a six week check post right carpal tunnel release. "He is doing well with no complaints. … He has normal range of motion of his fingers." The plan, per Mr. Thiffault's wishes, was to wait till early fall to release the left carpal tunnel. (AR-0697).

- An October 2002 note from Dr. Pyun in follow up for his PMR. He reported that **he "feels great … every symptom has gone away including the morning stiffness, pain, lack of movement, difficulty getting out of a chair. … He is sleeping well ..."** (AR-0671) (emphasis added).

- A November 2002 note by Dr. Trotter regarding his examination of Mr. Thiffault. "On questioning about his polymyalgia rheumatica [PMR] he says he is feeling very well now on 15mg of prednisone. … The prednisone has resolved his musculoskeletal and muscular problems and aches and pains…" **Dr. Trotter noted "[f]rom a work standpoint, the only thing keeping him out of work now is mental health issues."** (AR-0716) (emphasis added).

52. Sun Life also received the January 8, 2003 letter Dr. Grimaldi wrote at the request of Mr. Thiffault's attorney, summarizing the results of his treatment and evaluation of Mr. Thiffault. In his letter, Dr. Grimaldi commented on the two neuropsychological evaluations performed by Dr. Kent and the denial letter from Sun Life. (AR-0035).

53. By way of background, Dr. Grimaldi noted:

- Mr. Thiffault's problems appear to have started in childhood;
- He abused alcohol most of his adult life;
- He stopped drinking in 1993 after completing an alcohol treatment program;
- When he stopped drinking (in 1993), he went "down hill." (AR-0035-36)

54. Dr. Grimaldi noted that Dr. Kent had conducted neuropsychological evaluations in 1998 and 2000, concluded Mr. Thiffault was experiencing difficulty in selective areas of functioning, and the likely cause was his emotional disorder. (AR-0035-36). Dr. Grimaldi stated that Dr. Kent "incorrectly interprets the cause as emotional (due to depression), rather than neurological." (AR-0037).

55. Dr. Grimaldi commented on Sun Life's denial letter, including:

- He disagreed with Sun Life's statement that he failed to indicate limitations on his APSs.
- He noted that on the APS, the sections for indicating limitation are 5 (cardiac), 6 (physical) and 7 (mental);
- Both 5 (cardiac) and 6 (physical) are "not applicable;"
- For 7 (mental), he indicated Class 4 – marked limitations. (AR-0036).

56. Dr. Grimaldi stated that "the basis for Mr. Thiffault's vocational incapacity is not his Depressive Disorder or his Sleep Apnea, but rather his Attention Deficit Disorder. This disorder is definitely the result of neurological dysfunction not psychological or environmental factors." (AR-0036).

57. Dr. Grimaldi cited to a number of tests that he (a psychologist) administered to Mr. Thiffault in support of his argument that Mr. Thiffault suffers ADD. He stated "there is a high degree of consistency with Mr. Thiffault's symptom profile and the DSM IV (Diagnostic and Statistical Manual of the American Psychiatric Association-version four) criteria for Attention Deficit Disorder, inattentive type." (AR-0036, 38).

58. At Sun Life's request, Dr. James Sarni, a board certified specialist in physical medicine and rehabilitation, reviewed the entire file, including the materials Sun Life received from Mr. Thiffault's counsel in January 2003, from a medical standpoint. He opined that Mr. Thiffault had a light duty occupation and it is reasonable to restrict him to a sedentary to light duty occupation. He noted that there was "no reason why an individual with PMR [polymyalgia rheumatica] would be unable to perform such an occupation." He also noted that his restless leg syndrome "should not contribute to any disability." (AR-0527).

59. Thereafter, Sun Life sought a psychiatric review of Mr. Thiffault's appeal to determine whether he had an incapacitating psychiatric disorder (IPD) and learn more about Dr. Grimaldi's assertion that ADHD is neurological in nature and should not be considered a psychiatric condition. (AR-00529-531).

60. At Sun Life's request, Dr. Himber, a board certified psychiatrist reviewed the entire file, including the materials Sun Life received from Mr. Thiffault's counsel in January 2003. He found that there was limited objective data to support an IPD between May 1998 and

November 2000, but there was "no objective data supporting an IPD post 11/11/00." (AR-0523). Dr. Himber noted that "…the contemporaneous progress notes of Dr. Grimaldi do not support an IPD. There are no GAFs, no comprehensive mental status exams and his observations do not support and IPD. Eg 3/17/00-calm, thoughtful. 8/29/00 – verbal, calm, focused. 10/11/00 – stable, no present complaints. 12/10/00 – thinking of returning to work part-time." (AR-0522-23).

      61.    Dr. Himber found <u>no</u> support for a diagnosis of ADD, which he stated "is a lifelong condition and would not be the cause of an acute IPD." (AR-0522). Dr. Himber noted that:

- Neither Dr. Kent nor Dr. Gansler, both highly skilled and careful psychologists who evaluated and treated Mr. Thiffault, raised ADD as a diagnosis for him; and

- None of Mr. Thiffault's "non-psychiatric" treaters documented symptoms of ADD. For example, Dr. Pyun noted that he asked "pointed relevant questions" and is "very diligent" about taking his calcium. Dr. Calking made no mention of his being distractible or unfocused. Dr. Trotter noted no complaints of trouble concentrating or loss of focus (11/4/02). Dr. Phadke, who had followed Mr. Thiffault from 4/98 through 3/02, repeatedly noted normal mental status exams and normal memory testing. (AR-0521-22).

      62.    Dr. Himber disagreed with Dr. Grimaldi's opinion that Mr. Thiffault's ADD was previously masked by his alcoholism and that when he became sober, his ADD re-surfaced. Dr. Himber noted that Mr. Thiffault ceased drinking in 1993 and worked for many subsequent years without incapacitating symptoms becoming apparent. (AR-0522).

      63.    Dr. Himber also disagreed with Dr. Grimaldi's opinions "that ADD is a result of neurological dysfunction not psychological or environmental factors …" Dr. Himber noted that Dr. Grimaldi "quotes from the DSM-IV of the American Psychiatric Association which is a compendium of PSYCHIATRIC disorders, not neurological disorders." (AR-0522).

64. On February 5, 2003, Sun Life informed Mr. Thiffault's counsel of its decision reaffirming its denial of benefits under the terms of the Policy after full and fair review of all information in the file and the additional information provided on appeal. (AR-0014-20).

65. In its letter, Sun Life reviewed the terms of the Policy, including the limitation on benefits for disability due to mental illness. Sun Life outlined the content of the medical records and the actions it had taken to evaluate Mr. Thiffault's claim. Sun Life's actions included medical and psychiatric file reviews by a nurse, a licensed social worker, a board certified internal medicine physician, and a board certified specialist in psychiatric medicine (two times), and sending Mr. Thiffault for an independent medical examination, all prior to the initial denial, and once the appeal information was received, having the file reviewed by a board certified specialist in physical medicine and rehabilitation (Dr. Sarni), and a board certified specialist in psychiatric medicine (Dr. Himber). (AR-0014-20).

66. Sun Life reviewed in detail the opinions expressed by Drs. Sarni and Himber and noted that if Dr. Grimaldi was correct in his opinion that ADD "is not a psychiatric illness at all, but a neurological one" then he "would not be an appropriate source of treatment for ADD, as he his not a neurologist. … ADD is classified as a psychiatric condition by the American Psychiatric Association and is customarily treated by professionals who specialize in psychology, like Dr. Grimaldi." (AR-0017-19).

67. Sun Life concluded that "Mr. Thiffault's medical conditions do not contribute to limitations that prevent the performance of activities analogous to those performed in his own occupation. The conditions that do limit his ability to perform the duties of his own occupation are psychiatric in nature" and he has exhausted those benefits. (AR-0019).

68. Thereafter, Mr. Thiffault filed suit against Sun Life. (Plaintiff's Complaint).

SUN LIFE ASSURANCE COMPANY OF CANADA

By its attorney,


/s/ Elizabeth L. B. Greene
Joan O. Vorster, Esq., BBO #550375
Elizabeth L. B. Greene, Esq., BBO #561456
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: July 21, 2006

CERTIFICATE OF SERVICE

I hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 21, 2006.

/s/ Elizabeth L. B. Greene

Dated: July 21, 2006