UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WORCESTER, SS                                            DOCKET NO.: 4:05-cv-40011-FDS

VICTOR THIFFAULT,                          )
    Plaintiff                                           )
                                                             )
Vs.                                                            )
                                                             )
SUN LIFE ASSURANCE COMPANY OF CANADA,    )
    Defendants                                       )

**PLAINTIFF, VICTOR THIFFAULT'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In support of his Opposition to Defendant's Motion for Summary Judgment and pursuant to Local Rule 56.1, the Plaintiff, Victor Thiffault, ("Mr. Thiffault"), submits the following Concise Statement of Additional Material Facts of Record as to which he contends there is no genuine issue to be tried.

Mr. Thiffault agrees with the Defendant's statements of Undisputed Facts which are set forth in Paragraphs #'s 1 through 68 in Sun Life Assurance Company of Canada's ("Sun Life") Statement of Undisputed Facts in Support of It's Motion for Summary Judgment.

**CONCISE STATEMENT OF ADDITIONAL MATERIAL FACTS OF RECORD**

1. On July 14, 1995, Mr. Thiffault spoke with his treating physician, T. Hanlon, M.D. at the Fallon Clinic concerning his chest pain. (Administrative Record (hereinafter "AR")—0472). On July 18, 1995, Mr. Thiffault saw one of his treating physicians, Dr. Hanlon at the Fallon Clinic. The Medical Record states "He does report persistent chest discomfort….with his baseline EKG changes, I have recommended we proceed with an echo which will be set up."

(AR—0471). On July 21, 1995, Mr. Thiffault is seen by one of his treating physicians, Wayne Trottier, M.D., at the Fallon Clinic. After examination, Dr. Trottier's records states: "He comes in after having been seen for chest pain. On exam today, he does have a systolic ejection murmur which is old but he has what I believe is a rub. I asked Dr. Hanlon to listen to him, as well, and he certainly sounds different to him than he did a week ago. (AR—0469).

    2. On December 16, 1997, Mr. Thiffault is seen by a cardiologist at Fallon Clinic, Dr. Kirkpatrick. The medical records states: "Last two months he's been having recurrent chest discomfort. This he describes at an anterior chest pressure that begins spontaneously and sometimes is associated with discomfort in his arm….the pain lasts anywhere from five minutes to forty minutes in duration and is occurring on the average of every other day. These episodes are purely random and spontaneous. There is no exertional component to them. They are not related to eating. About a month ago he was hospitalized at Milford Hospital for several days for chest pain. MI was excluded. A week or ten days ago he was in a hospital in Philadelphia with chest pain. Apparently they wanted to keep him to do a cathertorization, but he declined wanting to return to New England. The patient has no history of Rheumatic Fever, and he has a history of heart murmur and previous Echocardiography. Has suggested a Aortic Sclerosis." (AR—0454).

    3. On May 28, 1998, Mr. Thiffault is seen by Lawrence J. Epstein, M.D., Director, Pulmonary Sleep Medicine Laboratory at The Veterans' Administration Medical Center in West Roxbury. The Medical Record states: "Every two—three days (Mr. Thiffault) will get weakness in legs when standing.

    4. On June 2, 1998, Mr. Thiffault underwent a comprehensive polysomnograph at St.

Vincent Hospital Sleep Disorder Center in Worcester, having been referred there by his treating physicians Wayne D. Trottier, M.D., his Primary Care Physician, and Jayant G. Phadke, M.D., Chief of Neurology at Worcester Medical Center who is Board Certified in Psychiatry, Neurology and Sleep Medicine (AR—0307). The comprehensive polysomnograph revealed as follows: "Patient spent a total of eight and one half hours in sleep lab out of which a very fragmented sleep was achieved for 77% of the time….less then 1% of time was spent in REM sleep…23% in periods of wakefulness after sleep onset…Respiratory disturbance was noted with pattern reminiscent of upper airway resistance syndrome with periods of hypopnea followed by arousals in the form of leg movements, speeding up the electroencephalogram, increased respiratory effort and at times mild desaturation of the order of about 2% from a baseline of 93%—94%….He also had periodic limb movements which at times produced electrographic arousals, the leg movements seemed mostly in the first half of the night. Assessment: This patient has a problem of apnea/hypopneas with also a suggestion of an upper respiratory resistance syndrome…." (AR—0124—0125).

5. On June 29, 1998, Mr. Thiffault is examined by Lawrence J. Epstein, M.D., Director, Pulmonary Sleep Medicine Laboratory at The Veterans' Administration Medical Center in West Roxbury. The medical record states "The interpretation of the overnight sleep study results is 'difficult,' and findings suggestive of narcolepsy." (AR—0423).

6. On July 20, 1998, Mr. Thiffault is examined by Ahmad Khayat, M.D., Fellow, Pulmonary and Critical Care Division and by Leonard Sicilian, M.D., Staff, Pulmonary and Critical Care Division, at the New England Medical Center in Boston. The medical record states that Mr. Thiffault's "obstructive sleep apnea which was diagnosed by sleep study, was

3

appropriately treated with C—PAP. This has eliminated the obstructive apnea component of his sleep disorder. He, however, continued to have sleep disturbance and daytime somnolence, which, at least in part, was related to his limb movement disorder. He should observe the affects of his treatment on his performance, memory, somnolence and level of fatigue. Should his limb movements come under control, while he continues to have memory deficits, we would then recommend a comprehensive neurophychiatric evaluation for his memory loss to rule out early dementia." (AR—0440—0441).

    7. On September 22, 1998, the Director of Human Resources for Easy Day Manufacturing Company (Mr. Thiffault's Employer) completed a Long Term Disability Claim Statement for Sun Life concerning Mr. Thiffault. The claim form states the last date Mr. Thiffault worked was May 22, 1998 and that the reason he stopped working was "sleep apnea which causes him to fall asleep during the daytime (work)." One section of the form requested information about the stress/non-physical aspects of Mr. Thiffault's occupation. The Form asked the following:

    Question: Does employee have to answer customer complaints?

    Answer: "Yes."

    Question: Is employee responsible for the overall performance of his/her particular
        department?

    Answer: "Yes."

    Question: Number of people this person supervises?

    Answer: "Four".

    (AR—0116—0117).

    8. On October 14, 1998, Mr. Thiffault himself filled out a Long Term Disability Claim

4

Statement for Sun Life. One section of the form is entitled: "Information about the condition causing your disability." The Form requests the date that Mr. Thiffault first noticed symptoms of his illness. Mr. Thiffault answered: "11/97". The Form then requested that he describe the nature of his illness and his first symptoms. He answered: "Pain in Limbs". (AR—0119—0120).

9. On October 19, 1998, Mr. Thiffault's Primary Care Physician completed the Attending Physician's Statement for Sun Life. Under the section entitled "Diagnosis", Dr. Trottier identifies Mr. Thiffault's subjective symptoms as follows:

- Chest pains;
- GI upset;
- Headaches;
- Cognitive difficulty;
- Lower extremity aching;
- Leg twitching;
- Fatigued during day;
- Frequent rest periods;
- Unable to do sustained physical activity.

Under "Objective Findings", Dr. Trottier states: "Normal sleep studies." Under "Physical Impairment", Dr. Trottier states: "Class 5—Severe limitation of functional capacity: Incapable of minimum (sedentary) activity by 75—100%." Under the section for "Mental Impairment", Dr. Trottier states: "Class 5—Patient has significant loss of psychological,

physiological, personal and social adjustments (severe limitation)." Under the section entitled "Limitations", Dr. Trottier states: "In a normal day, the patient is able to do zero percent of any

5

physical activity (bend, squat, climb, twist body, push, pull, balance, kneel, crawl, grasp, reach)".

Dr. Trottier also identifies in the form that Mr. Thiffault in a normal day cannot do any standing or walking for any period of time, by marking the box entitled "None". (AR—0121—0122).

10. On December 15, 1998, Mr. Thiffault is examined by A. Ehrlich, M.D. at the Fallon Clinic who states in the medical record: "Patient comes in today because of chest pain. This started about noontime yesterday. The pain is associated with breathing problems…he does have a history of having had chest pains in the past." (AR—0731).

11. A Medical Report dated December 20, 1998 from Lawrence Epstein, M.D., Director, Pulmonary Sleep Medicine Laboratory at The Veterans' Administration Medical Center in West Roxbury is written to Sun Life concerning Mr. Thiffault. The medical report states: "Mr. Victor Thiffault has been under my care for treatment of significant sleep disorders. He has a combination of disorders which lead him to experience excessive daytime sleepiness and cause him to be unable to perform the required duties of his job. Mr. Thiffault has Obstructive Sleep Apnea, a disorder causing repetitive episodes of stopping breathing while sleeping, Periodic Limb Movements of Sleep, a <u>neurological disorder</u> resulting in repetitive jerking of his limbs…" (emphasis added) (AR—0387).

12. On December 20, 1998, Sun Life makes a comment in Mr. Thiffault's Long Term Disability Claim File as follows: "Note from VA indicates he has obstructive sleep apnea…need psych records. Psych records not in but appears also medical complaints. Our medical department has not reviewed. Will refer to clarify medical condition while waiting for psych records." (AR—0385).

13. By letter dated July 24, 2000, Sun Life writes to Mr. Thiffault as follows: "The

policy provides for a maximum benefit of twenty four months for mental and nervous conditions. However, you have indicated that you are disabled as a result of other conditions not related to a mental and nervous condition." (AR—0314).

14. On August 3, 2000, Dr. Phadke, Chief of Neurology at Worcester Medical Center, completes an Attending Physician Form for Sun Life and provides the following diagnosis:

- "Obstructive Sleep Apnea;
- Periodic Limb Movements of Sleep;
- Depression;
- All contributing to excessive daytime sleepiness, poor information processing, impaired attention and recall.

Objective Findings:

- Cognitive dysfunction;
- Decreased attention;
- Decreased memory.

Progress: "Patient has retrogressed—continues to have cognitive disturbance."

(AR—0328—0329)

15. On January 1, 2002, Mr. Thiffault completed a Claimant Activity Questionnaire for Sun Life. One of the questions asks: *Please provide a detailed list of what you perceive to be your functional limitations and how they impact your activities of daily living and ability to engage in employment.*

Answer: "Cognitive processing—cannot remember and digest information particularly if spoken, need a list of days appointments in order to keep. Any form is extremely confusing and

7

no longer completes without assistance. Leg and hand pain—cannot grasp objects for long time, cannot sit or stand in one place for too long. Do not have good balance—fatigue—must rest after simplest activity. Tire very easily." (AR—0242—0243).

16. On February 26, 2002, Mr. Thiffault is examined by Edward Calkins, M.D. of Orthopedics and Sports Medicine at Fallon Clinic. The medical record states: "The patient's medical history is significant for ADHD and Sleep Apnea." (AR—0706).

17. On October 16, 2002, Mr. Thiffault is examined by Elise Pyun, M.D. at Fallon Clinic. The medical records states: "Mr. Thiffault is here for follow up of PMR [Polymyalgia Rheumatica] Impression: PMR…anemia. This might be anemia of chronic disease which is commonly seen with PMR…" (AR—0671—0672).

18. On October 24, 2002, Mr. Thiffault's Primary Care Physician, Wayne Trottier, M.D., at Fallon Clinic completed a Physician Statement for Sun Life. The Statement sets forth as to Diagnosis: "Carpal Tunnel Syndrome (CTS) Polymyalgia/Rheumatica (PMR) onset 8/02." As to Objective Findings, Dr. Trottier states: "increased sedimentation rate; anemia." As to Subjective Symptoms, Dr. Trottier states: "weakness, fatigue, pain, stiff joints." As to Medical History, Dr. Trottier states: "depression, sleep apnea dysthymid, panic, restless legs, ADHD, allergic rhinitis. Treatment: Carpal Tunnel release (right) prednazone for PMR." (AR—0023—0024).

19. On January 8, 2003, Joseph Grimaldi, Ph.D., Mr. Thiffault's treating psychologist, wrote a medical report which was provided to Sun Life. Dr. Grimaldi's Curriculum Vitae attached to his Report identifies that he has a Ph.D. in psychology and completed a post-doctoral fellowship in the neurological and behavioral sciences. He is licensed in psychology in New York and Massachusetts and has been an expert witness in the New York State Superior Court

8

and the Federal Immigration Court. In his report, Dr. Grimaldi states: "In reviewing the letter of denial by Sun Life, they appear to base their objection on Mr. Thiffault having a psychological disorder rather than a neurological or medical disorder. They appear to state that any vocational incapacity was due to mental illness and they will not approve disability payment under these conditions unless the patient is in the hospital. Although they make note of my diagnosis of Attention Deficit Disorder, they state there is no evidence to substantiate this. They further stated that I failed to indicate any limitations in my report to them. They also make reference to a neuropsychological evaluation performed by Dr. David Gansler (Gangler?) in 1999, but I have not seen any such report. First of all, they (Sun Life) appear to have not read my reports to them very carefully. The sections for indicating limitation on their form are numbered 5, 6, and 7. Both 5 and 6 are not applicable. Number 7 is, and I most definitely did indicate limitations. Specifically, I indicated that the 'Patient is unable to engage in stress situations or engage in interpersonal relations (Marked limitation)'—Class 4. Class 5 is reserved for someone who must live in supervised settings, e.g. hospital or group home…Secondly, the basis for Mr. Thiffault's vocational incapacity is not his depressive disorder or his sleep apnea, but rather his Attention Deficit Disorder. This disorder is definitely the result of neurological dysfunction not psychological or environmental factors. The evidence for Mr. Thiffault's dysfunction comes from several sources. The clinical presentation of Mr. Thiffault's symptoms, as mentioned above, is consisted with Attention Deficit Disorder. In addition to these clinical findings,

significant deficits were found on the two neuropsychological exams administered by Dr. Kent. I also found problems on the Conners Rating Scale (a standardized measure of Attention Deficit Disorder), which I administered to Mr. Thiffault…Dr. Kent's evaluations consistently find

9

difficulties in Mr. Thiffault's neurocongnitive functioning that is consistent with Attention Deficit Disorder. However, he incorrectly interprets the cause as emotional (due to depression) rather than neurological. He does not rule out the possibility of a neurological origin, but because of the obvious depressive symptoms, he assumes that is the cause of the dysfunction. There is certainly no lack of evidence that Mr. Thiffault is and has been depressed for many years. Of course the presence of a depressive disorder complicates any other problems that Mr. Thiffault has….In summary, Mr. Thiffault is suffering from Attention Deficit Disorder, inattentive type. This disorder is definitely the result of neurological dysfunction not psychological or environmental factors. As a result, he can no longer perform his duties as the Director of Distribution and Facilities. Furthermore, Mr. Thiffault cannot function in any work environment that has the usual demands of organizing and completing tasks especially new ones, within certain time limits." (AR—0035—0045).

     20. On January 13, 2003, Sun Life's Claim Administrator, Beth Bixler, identifies in her notes that Mr. Thiffault's diagnosis as follows:

- "ADHD;
- Depression;
- Sleep Apnea with restless leg syndrome;
- Polymyalgia/Rheumatica;
- Bi-lateral CTS;


- Aortic Sclerosis with Systolic Ejection Murmur."

She writes as a summary: "Appeal medicals as follows:…**there are more records in the packet provided by ATTY: However, these pre-date initial claim decision in 4/02.**

10

**Please review them anyway as part of full and objective appeal review.**" (AR—0741—0743).

22. On February 5, 2003, Sun Life wrote to Mr. Thiffault's Attorney, Karen L. Stern, as follows: "Long Term Disability declined because Victor Thiffault was not Totally Disabled as defined in the policy contract. Specifically, Mr. Thiffault could not be considered Totally Disabled because he was capable of performing the duties of his own occupation as defined by the policy contract and because he had surpassed the contractual limitation of twenty four months for payment of claims due to a mental illness and was not hospitalized as a result of a medical illness….The information provided with the original claim for benefits as well as that provided on appeal indicate that Mr. Thiffault is being treated for Polymyalgia/Rheumatica (PMR), Sleep Apnea, Attention Deficit Disorder (ADD), and Depression….None of the providers indicate he is limited from performing either sedentary or light activities." (AR—0511—0517).

22. Mr. Thiffault's former employer, Easy Day Manufacturing Company, under Group Policy Number: 44365, which was an employee welfare benefit plan as defined by ERISA, states under Section IV—Benefit Provisions—<u>Termination of Long Term Disability Benefits: All Directors, Managers, Supervisors, Excluding the Chairman of the Board</u>:

> # 6. "The date Sun Life determines the employee is able to perform on a full-time basis all of the material and substantial duties of his own occupation, even if the Employee
>
> chooses not to work." (AR—0167).

23. Mr. Thiffault's job description for his position at Easy Day Manufacturing Company as Director of Distribution and Facilities is set forth in a detailed three page job description. The

11

job description is broken down into eight major responsibilities, twenty three regular duties and a

section identifying how the person in the position is expected to accomplish the duties of

Director of Distribution and Facilities.  (AR—0759—0761).

                    Victor Thiffault, Plaintiff,
                    By his Attorney,


                    __/s/ Karen L. Stern_____
                    Karen L. Stern, Esquire
                    BBO#550391
                    BERNSTEIN, BURWICK & TUCKER, LLC
                    10 Mechanic Street, Suite 150
                    Worcester, MA  01608
                    (508) 755-5555

Dated:  August 4, 2006

**Certificate of Service**

     I, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of the Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 4, 2006.


Dated:  August 4, 2006                  \_/s/ Karen L. Stern_____
                                               Karen L. Stern, Esquire