**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
WORCESTER, SS                                    DOCKET NO.: 4:05-cv-40011-FDS

| | |
|---|---|
| VICTOR THIFFAULT, | ) |
|     Plaintiff | ) |
| | ) |
| Vs. | ) |
| | ) |
| SUN LIFE ASSURANCE COMPANY OF CANADA, | ) |
|     Defendants | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BACKGROUND**

The Plaintiff, Victor Thiffault ("Mr. Thiffault"), seeks to recover payment for long-term disability benefits under an employee welfare benefit plan ("the Plan"), provided by his employer, Easy Day Manufacturing Company Suburbanite Home of Butler Home Products, Inc. ("Easy Day Manufacturing"), and funded by a group insurance policy ("the Policy") issued by the Defendant, Sun Life Assurance Company of Canada ("Sun Life"). This case is governed by the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. §1001 et seq.

After paying Mr. Thiffault disability payments for 24 months under the Policy, Sun Life denied Mr. Thiffault any further benefits on the grounds he was disabled due to a "Mental Illness" and had exhausted all benefits. Mr. Thiffault appealed the denial. Sun Life upheld its decision to deny Mr. Thiffault further benefits.

After exhausting his administrative remedies, Mr. Thiffault filed this action against Sun Life for a violation of ERISA on the grounds that Sun Life's decision was unreasonable, arbitrary and capricious.

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND PLAINTIFF'S CONCISE STATEMENT OF ADDITIONAL MATERIAL FACTS[1]**

Mr. Thiffault incorporates by reference both Defendant's Statement of Undisputed Facts (¶¶ 1 through 68), and Plaintiff's Concise Statement of Additional Material Facts (¶¶ 1 through 23), prepared pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1 and filed contemporaneously with this Memorandum.

## ARGUMENT

**A. FACTUAL CONTEXT**

On September 22, 1998, Easy Day Manufacturing filed a Long Term Disability Claim Form with Sun Life concerning its employee, Mr. Thiffault. The form states that the reason Mr. Thiffault stopped working was: "Sleep Apnea which causes him to fall asleep during the daytime (work)." (PAF at Paragraph 7). On October 4, 1998, Mr. Thiffault completed a Long Term Disability Claim Statement for Sun Life identifying the nature of his illness and first symptoms as "pain in limbs", and stating he first noticed the symptoms of his illness in November 1997. (PAF at Paragraph 8).

In November 1997, Mr. Thiffault was hospitalized in Philadelphia with chest pain. The cardiologists in Philadelphia wanted to perform a cathertorization; however, Mr. Thiffault declined, choosing to return to New England. Also in November 1997, Mr. Thiffault was hospitalized at Milford Hospital in Massachusetts for several days due to chest pain. On December 16, 1997, Mr. Thiffault was examined by Dr. Kirkpatrick, a Cardiologist at Fallon Clinic whose medical records reveal that Mr. Thiffault was having recurrent chest discomfort and

---

[1] Defendants Statement of Undisputed Facts will be referred to as "DUF".
Plaintiff's Concise Statement of Additional Material Facts submitted herewith will be referred to as "PAF".

pressure for the last two months, sometimes associated with discomfort in his arm.  The pain was lasting between 5 to 40 minutes, every other day.  Dr. Kirkpatrick medical record notes that Mr. Thiffault has a history of a heart murmur and there is a suggestion of Aortic Sclerosis.  (PAF at Paragraph 2).  Mr. Thiffault, according to the medical records provided to Sun Life, had a history of chest pain going back to 1995 and he evidenced baseline EKG changes.  According to the medical records provided to Sun Life, Mr. Thiffault suffered from a systolic ejection heart murmur.  (PAF at Paragraph 1).

On June 2, 1998, following a referral to St. Vincent Hospital Sleep Disorder Center in Worcester by both his primary care Physician, Wayne Trottier, M.D. and by Jayant G. Phadke, M.D., Chief of Neurology at Worcester Medical Center, Mr. Thiffault underwent a comprehensive polysomnograph.  This test revealed that he suffered from Apnea/Hypopneas with a suggestion of an Upper Respiratory Resistance Syndrome.  (PAF at Paragraph 4).  The polysomnograph was then reviewed on June 29, 1998 by Lawrence J. Epstein, M.D., Director of the Pulmonary Sleep Medicine Laboratory at the Veteran's Administration Medical Center in West Roxbury who opined that the findings were suggestive of narcolepsy.  (PAF at Paragraph 5).

On July 20, 1998, Mr. Thiffault was examined by both a Fellow, Ahmad Khayat, M.D. and also a Staff Member, Leonard Sicilian, M.D., at the Pulmonary and Critical Care Division at the New England Medical Center in Boston whose medical records reveal that Mr. Thiffault continued to suffer from sleep disturbance and daytime somnolence which was related, in part, to his Limb Movement Disorder (during sleep).  (PAF at Paragraph 6).

On October 19, 1998, Mr. Thiffault's Primary Care Physician, Wayne Trottier, M.D. completed the Attending Physician's Statement for Sun Life.  In the Diagnosis section, Dr. Trottier identified Mr. Thiffault's subjective symptoms as:  chest pains; GI upset; headaches;

3

cognitive difficulty; lower extremity aching; leg twitching; fatigued during day; frequent rest periods; and unable to do sustained physical activity. (PAF at Paragraph 9).

On December 15, 1998, Mr. Thiffault was seen at the Fallon Clinic due to chest pain associated with breathing problems. (PAF at Paragraph 10).

On December 20, 1998, Lawrence Epstein, M.D., Director, Pulmonary Sleep Medicine laboratory at the Veterans' Administration Medical Center writes to Sun Life stating that Mr. Thiffault has been under his care for treatment of significant sleep disorders causing him daytime sleepiness which renders him unable to perform the regular duties of his job at Easy Day Manufacturing. Dr. Epstein's diagnosis as set forth to Sun Life is: "Obstructive Sleep Apnea, a disorder causing repetitive episodes of stopping breathing while sleeping; Periodic Limb Movements of Sleep, a <u>neurological disorder</u> resulting in repetitive jerking of his limbs (emphasis added)." (PAF at Paragraph 11).

All this medical information was provided to Sun Life by December 20, 1998. Despite this evidence of a medical disability, Sun Life's own Disability Claim File concerning Mr. Thiffault, reveals the following Memorandum: "Note from VA indicates he has sleep apnea…need psych records. Psych records not in but appears also medical complaints. Our medical department has not reviewed. Will refer to clarify medical condition while waiting for psych records." (PAF at Paragraph 12). Sun Life, despite overwhelming medical evidence of Mr. Thiffault's physical disabilities, almost immediately classified Mr. Thiffault's claim as a Mental Illness Disability. Why? By classifying Mr. Thiffault's claim as a Mental Illness, Sun Life's monetary exposure would be limited under the Policy to just 24 months of Long Term Disability payments, unless Mr. Thiffault was confined in a Hospital or Institution licensed to provide psychiatric treatment at the end of the 24 month period. If he had a medical disability, he would be entitled to the benefit provisions under Section IV entitled: <u>Termination of Long</u>

4

<u>Term Disability Benefits: All Directors, Managers, Supervisor, Excluding the Chairman of the Board</u>, which states:

> *#6. The date Sun Life determines the employee is able to perform on a full-time basis all of the material and substantial duties of his own occupation, even if the Employee chooses not to work.* (PAF at Paragraph 22).

Had Sun Life reviewed the substantial medical evidence submitted on behalf of Mr. Thiffault, he should have been classified with a Medical Disability not a Mental Illness. Granted, Mr. Thiffault's records reveal a history of depression and he continued treatment with a psychologist after he filed his claim in 1998 and continued treatment through 2002; however, Mental Illness was not the disabling condition which rendered Mr. Thiffault unable to perform his regular duties or return to work in any capacity, it was a physical condition.

**B.  SUMMARY JUDGMENT STANDARDS**

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56 (c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant…By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party…." <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir.1995) (citations omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. <u>Cadle Co. v. Hayes</u>, 116 F.3d 957, 959 (1st Cir.1997).

5

**C.  ERISA CLAIM**

A denial of ERISA-plan benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Terry v. Bayer Corp. 145 F.3d 28, 35 (1st Cir.1998) (citation and internal quotation marks omitted).  If the administrator or fiduciary possesses the requisite discretion, "[n]ormally…its decision must be upheld unless arbitrary, capricious, or an abuse of discretion."  Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 183 (1st Cir.1998) (citations and internal quotation marks omitted).  "This standard means that [the administrator's or fiduciary's] decision will be upheld if it was within [its] authority, reasoned, and supported by substantial evidence in the record.  Substantial evidence, in turn, means evidence reasonably sufficient to support a conclusion.  Sufficiency, of course does not disappear merely by reason of contradictory evidence."  *Id.*, 144 F.3d at 184 (citations and internal quotation marks omitted).

**D.  MR. THIFFAULT'S DISABILITY SHOULD NOT HAVE BEEN CLASSIFIED BY SUN LIFE AS A MENTAL ILLNESS WHICH MAKES THE DECISION TO TERMINATE BENEFITS UNREASONABLE, ARBITRARY AND CAPRICIOUS**

The Administrative Record reveals that there is no question that Mr. Thiffault suffered from Obstructive Sleep Apnea and Periodic Limb Movements of Sleep.  The Director of the Pulmonary Sleep Medicine Laboratory at the Veterans' Administration Medical Center, Lawrence Epstein, M.D., clearly set forth in a medical report to Sun Life on December 20, 1998, that Mr. Thiffault's condition was the result of neurological disorders.

Sun Life made an arbitrary and capricious decision to ignore the myriad of medical evidence presented in order to label Mr. Thiffault's long term disability claim as a "Mental Illness".

6

Mr. Thiffault held the position of Director of Distribution Facilities.  According to the Policy, the definition for "Total Disability" which applies to Mr. Thiffault is:  "Total Disability or Totally Disabled means the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation."  (DUF at Paragraph 3).  "Injury" means bodily impairment resulting from an accident and independently of all other causes. (DUF at Paragraph 4)  "Sickness" means illness, disease or pregnancy.  (DUF at Paragraph 5). "Mental Illness" means mental, nervous, psychological, emotional diseases, or behavioral disorders of any type.  (DUF at Paragraph 7).

Sun Life notes in its memorandum in Support of its Motion for Summary Judgment that in certain Attending Physician statements provided to Sun Life by Mr. Thiffault's medical providers, the section in the statement entitled "Cardiac" is left blank.  (DUF at Paragraphs 35; 36; 42; 47; 48; 55).

The fact is that Sun Life knew from the inception of this claim that Mr. Thiffault had a serious cardiac situation, in addition to other medical problems.  Despite the medical records, Sun Life chose only to have Mr. Thiffault's records reviewed in January 1999 by Alice Cluette, R.N.  This Nurse determined that Mr. Thiffault's sleep apnea was "well controlled" and that "his complaints of periodic limb movements most definitely would not preclude him from performing his own occupation.  However, he does appear to have psych issues which need to be addressed."  (DUF at Paragraph 13).

Based upon this Nurse's assessment, Mr. Thiffault was then labeled and pigeon-holed as having a "Mental Illness" Disability by Sun Life.  Sun Life then arranged a neuropsychological independent examination of Mr. Thiffault with David Gansler, Ph.D.  (DUF at Paragraph 22). No independent medical examination of Mr. Thiffault was ever performed by Sun Life to address the medical conditions he and his medical providers claimed were causing his disability.

Sun Life sent Mr. Thiffault's records to be reviewed by a psychiatrist, Dr. Ronald Pies. His medical records were sent to be reviewed by an internal medicine physician, Dr. Hatty Tsai. Dr. Tsai is neither a specialist in either neurology or sleep disorders. It was an arbitrary and capricious decision by Sun Life not to have Mr. Thiffault actually examined for his medical conditions and also not to have his records reviewed by an appropriate medical specialist.

Following Sun Life's receipt of Dr. Gansler's IME Psychological Report, this Insurer sent the Report for further comment by Dr. Pies (a psychiatrist) and Shelly Pratt, MSW, LICSW. (DUF at Paragraphs 30-31).

May 8, 2000 was the first notice to Mr. Thiffault that Sun Life deemed his long term disability claim to be the result of "Mental Illness". (DUF at Paragraph 34). Mr. Thiffault then disputed Sun Life's determination that he suffered from "Mental Illness". Sun Life wrote to Mr. Thiffault on July 24, 2000 and stated: "The policy provides for a maximum benefit of twenty four months for mental and nervous conditions. However, you have indicated that you are disabled as a result of other conditions not related to a mental or nervous condition." (PAF at Paragraph 13).

On August 13, 2000, Dr. Phadke, Chief of Neurology at Worcester Medical Center completed another Attending Physician Statement for Sun Life providing the following diagnosis: "Obstructive Sleep Apnea; Periodic Limb Movements of Sleep; Depression; All contributing to excessive daytime sleepiness, poor information processing, impaired attention and recall." (PAF at Paragraph 14).

On February 26, 2002, Edward Calkins, M.D. at Fallon Clinic noted that Mr. Thiffault's medical history was significant for Attention Deficit Hyperactivity Disorder ("ADHD") and Sleep Apnea. (PAF at Paragraph 16). On October 16, 2002, Elise Pyun M.D. one of Mr.

8

Thiffault's treating physicians at Fallon Clinic identifies in Mr. Thiffault's medical record: "PMR…anemia. This might be anemia of chronic disease which is commonly seen with PMR." [2]

On October 24, 2002, Mr. Thiffault's treating physician, Wayne Trottier, M.D. completed an Attending Physician Statement for Sun Life identifying his diagnosis as: "Carpal Tunnel Syndrome (CTS) and Polymyalgia/Rheumatica (PMR) onset 8/02." Subjective symptoms: "weakness, fatigue, pain, stiff joints." Medical History: "sleep apnea dysthymid, restless legs, ADHD, allergic rhinitis, depression, panic."

By a medical report dated January 8, 2003, Joseph Grimaldi, Ph.D., Mr. Thiffault's treating psychologist, wrote a report which was provided to Sun Life. Dr. Grimaldi set forth in detail why Mr. Thiffault's disabling condition was a neurological dysfunction and was not the result of psychological or environmental factors. Dr. Grimaldi also provided his Curriculum Vitae with his Report which sets forth he obtained a Ph.D. in psychology and completed a post-doctoral Fellowship in the neurological and behavioral sciences. (PAF at Paragraph 19).

On February 5, 2003, Sun Life made its final denial of benefits to Mr. Thiffault concluding that "Mr. Thiffault's medical conditions do not contribute to limitations that prevent the performance of activities analogous to those performed in his own occupation. The conditions that do limit his ability to perform the duties of his own occupation are psychiatric in nature" and therefore, he has exhausted his benefits. (DUF at Paragraph 67).

**E. PHYSICAL VS. MENTAL**

The label by Sun Life that Mr. Thiffault suffered from a "Mental Illness" is generally a subjective judgment and is based upon extra-psychiatric factors. There is a blurring of the boundaries between mental and physical illness. Most all disorders have both "mental" and

---

[2] PMR: Polymyalgia/Rheumatica.

9

"medical" or "biological aspects" with different disorders. Many mental diseases have very real and treatable physical components that go under-recognized. Also, many physical diseases have very real and treatable physical components that are either under-recognized or under-appreciated.

It is indisputable the strong genetic, neurochemical and biologically driven bases of many mental illnesses. With the advances in science and technology, especially through the use of MRIs and PET Scans we know much about how the brain operates. We know the physical mechanics of mood and can directly manipulate mood through medication. Scientists now know that memory is a physical brain process.

Sun Life's determination that Mr. Thiffault's disability was a Mental Illness, in the face of overwhelming medical records to the contrary, was an arbitrary and capricious decision, not supported by the evidence submitted to Sun Life.

### F.  SUN LIFE'S DECISION TO CLASSIFY MR. THIFFAULT'S DISABILITY AS A MENTAL ILLNESS IS AN UNREASONABLE, ARBITRARY AND CAPRICIOUS DECISION

The First Circuit has set forth the deferential standard a district judge must follow in reviewing ERISA claims. *See* Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir.2002).

Under ERISA, an insurer's termination decision will be reviewed under a deferential arbitrary and capricious standard where the language of the underlying plan reserves discretion to the insurer in determining eligibility for benefits. A judge "must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits,"

quoting Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 418 (1st Cir. 2000). "The arbitrary and capricious standard asks only whether the fact finder's decision is plausible in light of the record as a whole." Leahy v. Raytheon Co., 315 F3d 11, 17 (1st Cir. 2002).

In Colby v. Unumprovident, 328 F. Supp.2d 186 (D. Mass. 2004), Judge Tauro held that the decision to terminate benefits was arbitrary and capricious, and the subsequent denials of the participant's appeals were arbitrary and capricious. Judge Tauro states:

> *Despite the great deference that courts must give such determinations, this court finds that Unum's decision to terminate Colby's benefits was arbitrary and capricious. It is undisputed that Colby suffered his second stroke in January 2001. It is also undisputed that Unum initially considered his condition debilitating enough to award him long-term disability benefits. And, while the Record certainly shows that Colby has made significant progress in terms of improving from his stroke, there is no evidence that Colby has recovered sufficiently to engage in "sustained light functional capacity" work.*
>
> *This Court is aware that Unum is not required to give special deference to the opinion of a claimant's treating physician. Unum, however, "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." And, none of Colby's treating physicians has indicated that he has improved sufficiently to engage in "sustained light functional capacity" work. In fact, all of them recount the same impediment-limitation due to fatigue.*

quoting Colby v. Unumprovident, 328 F.Supp. 2d 186, 191-192 (footnotes omitted).

The primary focus of Sun Life in the administrative appeal process concerning Mr. Thiffault was Sun Life's efforts to disagree with Dr. Grimaldi's opinion that Mr. Thiffault's Attention Deficit Disorder ("ADD") is a neurological dysfunction. Sun Life appears to dismiss the evidence presented by Mr. Thiffault of his medical disability following the initial denial from

11

Sun Life concerning his diagnosis of Polymyalgia/Rheumatica with Anemia, an Anemia of Chronic Disease. (PAF at Paragraph 17).

Sun Life's final denial letter dated February 5, 2003 states: "The information provided with the original claim for benefits as well as that provided on appeal indicate that Mr. Thiffault is being treated for Polymyalgia/Rheumatica ("PRM"), Sleep "Apnea, Attention Deficit Disorder, and Depression…None of the providers indicate he is limited from performing either sedentary or light duties." (PAF at Paragraph 21).

In his medical report dated January 5, 2003, which was submitted to Sun Life on appeal, Dr. Grimaldi states that Sun Life "appear to have not read my reports to them very carefully. The sections for indicating limitation on their form are number 5, 6 and 7. Both 5 and 6 are inapplicable. Number 7 is, and I most definitely did indicate limitations. Specifically, I indicated that the 'Patient is unable to engage in stress situations or engage in interpersonal relations (Marked Limitation)'—Class 4. Class 5 is reserved for someone who must live in supervised settings, e.g. hospital or group home…In summary, Mr. Thiffault is suffering from Attention Deficit Disorder, inattentive type. This disorder is definitely the result of neurological dysfunction not psychological or environmental factors. As a result, he can no longer perform his duties as the Director of Distribution and Facilities. Furthermore, Mr. Thiffault cannot function in any work environment that has the usual demands of organizing and completing tasks, especially new ones, within certain time limits." (PAF at Paragraph 19).

Finally, Sun Life's Claims Administrator, Beth Bixler identifies in her notes dated January 13, 2003 and contained in Sun Life's Disability File that Mr. Thiffault's diagnosis is as follows:

- Depression;

- Sleep Apnea with Restless Leg Syndrome;

- Polymyalgia/Rheumatica;

- Bi-lateral Carpal Tunnel Syndrome; and

- Aortic Sclerosis with Systolic Ejection Murmur.

In Sun Life's final denial letter to Mr. Thiffault dated February 3, 2003, Sun Life fails to identify the following diagnosis for which there was overwhelming medical evidence presented to the Insurer:

- Sleep Apnea with Restless Leg Syndrome;

- Bi-Carpal Tunnel Syndrome;

- Aortic Sclerosis with Systolic Ejection Murmur.

All of these are medical conditions outlined above which are omitted in Sun Life's denial letter dated February 3, 2003, are biological medical conditions. Sun Life arbitrarily chose to ignore these medical conditions in order to manipulate and support its conclusion, as initially determined by a Nurse consulting for Sun Life in January 1999, that Mr. Thiffault's medical conditions do not preclude him from performing his occupation, that it was his "psych issues" which precluded him from performing his occupation. (DUF at Paragraph 13).

The decision to label Mr. Thiffault as suffering from a Mental Illness and denying him any further long term disability benefits after paying him twenty-four (24) months of disability benefits, is an unreasonable, arbitrary and capricious decision by Sun Life.

## CONCLUSION

FOR THE FOREGOING REASONS, Defendant's Motion for Summary Judgment should be DENIED.

                                  Victor Thiffault,
                                  Plaintiff,
                                  By his Attorney,

                                  __/s/ Karen L. Stern_____
                                  Karen L. Stern, Esquire
                                  BBO#550391
                                  BERNSTEIN, BURWICK & TUCKER, LLC
                                  10 Mechanic Street, Suite 150
                                  Worcester, MA  01608
                                  (508) 755-5555

Dated:  August 4, 2006

## Certificate of Service

    I, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of the Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 4, 2006.

Dated:  August 4, 2006        __/s/ Karen L. Stern_____
                                              Karen L. Stern, Esquire