**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| VICTOR THIFFAULT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil No. |
| v. | ) | 05-40011-FDS |
| | ) | |
| SUN LIFE ASSURANCE COMPANY OF | ) | |
| CANADA, | ) | |
| | ) | |
| Defendant. | ) | |

_____)

**MEMORANDUM AND ORDER ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a dispute under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et. seq., concerning the payment of long-term disability benefits. Plaintiff Victor Thiffault seeks to recover benefits under a policy issued by defendant Sun Life Assurance Company of Canada. Plaintiff alleges that he became permanently disabled on May 28, 1998. Sun Life initially paid disability benefits to plaintiff, but eventually determined that his inability to work was the result of a mental, rather than physical, illness, and that accordingly he was subject to a 24-month cap on benefits under the policy. Plaintiff appealed the denial, has exhausted all administrative remedies, and now seeks judicial review of the denial.

The parties have cross-moved for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, Sun Life's motion will be granted, and plaintiff's motion will be denied.

# I.    Factual Background

Victor Thiffault is a resident of Hopedale, Massachusetts. From 1985 until May 22, 1998, he worked for Butler Home Products as a Director of Distribution Facilities. While employed at Butler, he was covered by a group term insurance policy issued by Sun Life that Butler sponsored for its employees. The policy provided benefits for short-term and long-term disability. Sun Life served as the claims administrator for the policy.

## A.    The Terms of the Policy

Under the terms of the policy, a participant is deemed to have a "Total Disability" if "because of Injury or Sickness he is unable to perform all of the material and substantial duties of his own occupation." "Injury" is defined under the policy as "bodily impairment resulting directly from an accident and independently of all other causes." "Sickness" is defined as "illness, disease or pregnancy."

The policy limits benefits payable due to mental illness. Specifically, it provides that long-term disability benefits are not payable during "any period of Total or Partial Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care." "Mental Illness" is defined under the policy as "mental, nervous, psychological, emotional diseases, or behavioral disorders of any type."

The time for which mental illness benefits are payable is also limited. Under the policy, such benefits "will be payable for the first 24 months," after which they "will only be payable if the Employee is confined in a Hospital or Institution licensed to provide psychiatric treatment."

The policy requires that notice and proof of claim be provided to Sun Life prior to any payment under the policy, and that any proof "must be satisfactory to Sun Life."

2

### B.    Plaintiff's Initial Receipt of Disability Benefits

Plaintiff suffered a disability that prevented him from continuing his employment at Butler beyond May 22, 1998.  He initially applied for, and received, short-term disability benefits from Sun Life.  In October 1998, he applied for long-term disability benefits.  The medical records submitted at the time suggested that plaintiff suffered from pain in his limbs, sleep apnea, periodic movements of sleep, and depression.[1]  On December 28, 1998, Sun Life agreed to pay benefits to plaintiff while it continued to investigate his claim.  Sun Life also asked plaintiff for "all medical records pertinent to [plaintiff's] claim," including records from his psychiatrist.

In January 1999, a nurse who served as a medical consultant for Sun Life reviewed the medical records.  She found that plaintiff's sleep apnea appeared to be well-controlled and that his complaints of periodic limb movements "most definitely would <u>not</u> preclude him from performing his own occupation."  However, the consultant noted that plaintiff appeared to have "psych [*sic*] issues."

Following that review, Sun Life also had several physicians conduct record reviews and medical examinations.[2]  First, Dr. Ronald Pies, a psychiatrist, reviewed the records and concluded that plaintiff had a chronic depressive disorder dating back to at least 1994 that had not become worse over the years.  Dr. Pies also concluded that there was "insufficient data to show that his sleep disorder was of such severity to be vocationally incapacitating and there is data to the

---

[1] Specifically, plaintiff stated that his disability was caused by "pain in limbs."  According to Butler, plaintiff stopped working because of "sleep apnea which caused him to fall asleep during the daytime (work)."  Dr. Wayne Trotter, plaintiff's primary care physician, stated that plaintiff suffered from "depression/sleep apnea/periodic movements of sleep," which resulted in a variety of objective and subjective symptoms.

[2] During that time, plaintiff also saw a number of physicians for treatment concerning leg weakness, sleep disturbances, and chest pains.

contrary." Dr. Pies stated that there was insufficient objective data to establish that psychiatric or neuropsychiatric disorders caused any vocational incapacity. Second, Dr. Hatty Tsai, an internist, reviewed the records and observed that plaintiff's mild obstructive sleep apnea and periodic limb movements were being treated with "good results." Dr. Tsai also concluded that there was no evidence to support restrictions and limitations that would preclude plaintiff from returning to his occupation and suggested that his "complaints of fatigue were related to his depression." Third, David Gansler, Ph.D., performed an independent neuropsychology examination. Dr. Gansler diagnosed plaintiff as having anxiety disorder, depressive disorder, alcohol abuse, sleep apnea, and period limb movements during sleep. Dr. Gansler concluded that the last two conditions were "currently controlled by treatments." Although the neuropsychology test results were normal, Dr. Gansler observed that plaintiff's capacity for adaptive functioning was "quite limited" as a result of his psychopathology and cognitive defect. Dr. Gansler recommended that, in addition to adjusting his medications in order to "minimize side effects of fatigue and memory deficit," plaintiff should seek psychotherapy.

On July 12, 1999, Sun Life informed plaintiff that it had approved his claim for long-term disability benefits under the policy, retroactively effective November 19, 1998.

### C.     The Termination of Long-Term Disability Benefits

On May 8, 2000, Sun Life sent plaintiff a letter stating that his benefit payments would end on November 18, 2000, unless he was hospitalized as a result of his current condition. The letter explained that benefits were ending because plaintiff's disability was based on mental illness and was therefore subject to a 24-month cap in benefit payments.

After Sun Life sent the letter to plaintiff, a number of his physicians submitted attending

4

physician statement ("APS") forms.  On July 21, 2000, Dr. Joseph Grimaldi, plaintiff's

psychologist, and Dr. Mohammed Och, his psychiatrist, completed an APS in which they

indicated that plaintiff's progress had improved, but that he had medium physical impairment and

that mentally he was "unable to cope with anything."  On August 30, 2000, Dr. Jayant Phadke,

Chief of Neurology and Director of the Sleep Disorder Center at St. Vincent Hospital, completed

an APS indicating that plaintiff's cardiac and physical limitations were "n/a," that she did not

know what his mental impairment or limitations were, and that he was suffering from depression,

sleep apnea, and periodic limb movements during sleep.

Dr. David Kent, a psychologist and clinical neuropsychologist, evaluated plaintiff in

November 2000 and noted his medical history included suggestions that he might have attention

deficit/hyperactivity disorder ("ADHD") and atypical dementia.  However, after testing plaintiff's

function levels, Dr. Kent concluded that his scores were "more in line with scores obtained by

depressed patients or non-psychiatric individuals" than "those typically endorsed by adults

diagnosed with AD/HD."

Dr. Grimaldi submitted additional APS forms to Sun Life in June 2001 and January 2002.

In both documents, Dr. Grimaldi indicated that he had treated plaintiff monthly since 1996 with

cognitive-behavior therapy and psychiatric medications, and that plaintiff's progress was

unchanged.  He did not fill out the sections in the APS forms relating to physical restrictions or

limitations.  Dr. Grimaldi's diagnosis included depressive disorder, attention deficit disorder

("ADD"), and sleep apnea.  In both forms, Dr. Grimaldi categorized plaintiff's mental impairment

as a "Class 4," in that he was unable to handle stressful situations and had difficulty with

interpersonal relations.

On April 15, 2002, Sun Life sent plaintiff a letter stating that based on its review of his file, it had concluded that there was "no evidence to support [plaintiff's] physical inability to perform the material and substantial duties of [his] occupation as the Director of Distribution and Facilities."[3]  The letter further stated that although plaintiff was receiving psychological treatment, he could not receive mental illness disability benefits under the policy after 24 months unless he was hospitalized.  Because he was not hospitalized and did not have a physical disability, his claim was closed.

**D.    Plaintiff's Appeal**

On October 6, 2002, plaintiff requested a review of that decision.  Plaintiff contended that sleep apnea and ADD were both "organic in nature and can be referenced in physical conditions, thereby eliminating the mental illness reasoning of [defendant's] claim closure."  In addition, plaintiff contended that he suffered from carpal tunnel syndrome, pain in his extremities, and polymyalgia rheumatica.

Plaintiff subsequently submitted two additional APS forms to Sun Life.  The first, from Dr. Trotter, diagnosed plaintiff with carpal tunnel syndrome and polymyalgia rheumatica.  Dr. Trotter suggested that plaintiff had a "moderate limitation of functional capacity" and was at a "Level 4," which suggested that he was "capable of clerical/administrative (sedentary) activity." Dr. Trotter also noted that plaintiff's recent polymyalgia treatment "seem[ed] to be helping significantly" and that his physical limitations "should be abating already."  The second, from Dr. Och, his psychiatrist, diagnosed plaintiff with depression and ADHD.  Dr. Och suggested that

---

[3] The letter specifically referenced Dr. Pies's March 1999 review of plaintiff's medical file; Dr. Tsai's March 1999 review of the files; Dr. Gansler's April 1999 neuropsychological examination; and Dr. Grimaldi's January 2000 APS that did not indicate any restrictions or limitations.

plaintiff's progress had improved; he also left the sections on cardiac and physical capacities blank and indicated that plaintiff could not return to work because of "chronic psychiatric symptoms."

On December 12, 2002, Sun Life sent plaintiff another letter, stating that it appeared that his claim was "no longer for physical issues but for depression." On January 13, 2003, plaintiff's attorney sent Sun Life various medical records in support of his appeal request.[4] Among other things, the records suggested that plaintiff's sleep apnea was doing well, that his periodic limb movements were improved, that a procedure called carpal tunnel release had been successfully performed by Dr. Edward Calkins on his right hand, and that all polymyalgia symptoms were gone. Dr. Trotter specifically indicated "[f]rom a work standpoint, the only thing keeping him out of work now is mental health issues."

Plaintiff requested that Dr. Grimaldi write a letter summarizing the results of his treatment and evaluation. In the letter, Dr. Grimaldi criticized Dr. Kent's interpretation of two neuropsychological evaluations performed on plaintiff. Specifically, Dr. Grimaldi contended that Dr. Kent incorrectly interpreted the cause of plaintiff's problems as emotional, and due to depression, rather than neurological. Dr. Grimaldi also stated that the basis for plaintiff's vocational incapacity was not depression or sleep apnea, but ADD, which was "definitely the result of neurological dysfunction, not psychological or environmental factors."

After receiving the supporting materials, Sun Life conducted both a medical and

---

[4] These documents included letters from Dr. Phadke to Dr. Trotter in April 2000, December 2000, and March 2002; a May 2002 note from Dr. Calkins about his carpal tunnel syndrome; an October 2002 note from Dr. Elise Pyun about his polymyalgia; a November 2002 note by Dr. Trotter; and a January 2003 letter from Dr. Grimaldi.

psychiatric review. First, Dr. James Sarni, a physical medicine and rehabilitation specialist, reviewed plaintiff's file. Dr. Sarni suggested that plaintiff's job was a "light duty occupation" and that his polymyalgia and restless leg syndrome "should not contribute to any disability."[5] Next, Dr. Victor Himber, a psychiatrist, reviewed plaintiff's file in order to determine whether plaintiff had an incapacitating psychiatric disorder and to assess Dr. Grimaldi's assertion that ADD should not be considered a psychiatric condition. Dr. Himber concluded that there was no objective data supporting the contention that plaintiff had an incapacitating psychiatric disorder after November 11, 2000. He also found no support for a diagnosis of ADD and disagreed with Dr. Grimaldi's opinions that the disorder was the "result of neurological dysfunction not psychological or environmental factors." Dr. Himber pointed out that two of the psychologists who evaluated and treated plaintiff did not diagnose him with ADD, and none of his non-psychiatric health care providers documented any symptoms of the disorder.

On February 5, 2003, Sun Life informed plaintiff that it had decided to reaffirm its denial of benefits, based on reviews of the information in the file and the additional information provided on appeal.

## II.    Procedural History

Plaintiff filed a complaint in this Court on January 20, 2005, against both Sun Life and Butler alleging violations of 29 U.S.C. §§ 1132 and 1140. The claims against Butler were dismissed on January 5, 2006. Sun Life filed a motion for summary judgment on July 21, 2006. Plaintiff filed a cross-motion for summary judgment on August 8, 2006.

---

[5] Dr. Sarni stated that he could not comment on whether plaintiff's sleep apnea would be disabling.

8

III.    **Analysis**

    A.    **Standard of Review**

        1.    **The Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Although summary judgment is ordinarily a procedural tool for screening out cases that do not present trialworthy issues, in ERISA actions, it is "simply a vehicle for deciding the issues." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005). This is because "the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.,* 315 F.3d 11, 17 (1st 2002). As a result, in ERISA benefit denial cases, "the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'" *Bard v. Boston Shipping Assoc.,*471 F.3d 229, 235 (1st Cir. 2006), quoting *Orndorf*, 404 F.3d at 517.

        2.    **The Standard for Review of an Administrator's Discretionary Decision**

A denial of benefits under ERISA is reviewed under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989). When the plan administrator has been granted such discretion, its decision must be upheld unless "arbitrary, capricious, or an abuse of discretion." *Diaz v. Seafarers Int'l Union*, 13 F.3d 454 (1st Cir. 1994). This means that "the administrator's decision will be upheld if it is reasoned and supported by substantial evidence in the record." *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir. 2001) (internal quotations omitted). The fact that contradictory evidence exists "does not, in itself, make the administrator's decision arbitrary." *Id.* In reviewing an administrator's discretionary decision, the Court's role is limited to determining whether the administrator's interpretation of the benefits plan was made rationally and in good faith, not whether it was correct. *Brigham v. Sun Life of Canada*, 317 F.3d 72, 85 (1st Cir. 2003). Because questions of judgment are left to the administrator, its decision should be upheld even if the Court disagrees with it, so long as the administrator's interpretation of the plan is rationally related to a valid purpose and not contrary to the plan's plain language. *Moats v. United Mine Workers of America*, 981 F.2d 685, 688 (3rd Cir. 1992).

Sun Life asserts, and plaintiff does not appear to deny, that the plan grants it the discretionary authority to determine benefit eligibility and that therefore the deferential "arbitrary and capricious" standard applies to its decision. Specifically, Sun Life contends that the statement in the policy that "proof must be satisfactory to Sun Life" is sufficient to convey the requisite discretion. The Court agrees. *See, e.g., Brigham*, 317 F.3d at 82 (recognizing the "widespread acceptance" of the view that the use of the phrase "to us" after "satisfactory" indicates discretionary authority); *Depardo v. MFS/Sun Life Fina. Distr. Inc.*, 2005 WL 1225977, *4 (D. Mass. 2005) ("Must be satisfactory to Sun Life" is language sufficient to confer discretionary authority on the plan administrator); *Metropolitan Life Ins. Co. v. Socia*, 16 F.2d 66, 69 (D.

10

Mass. 1998) (holding that the phrase "all proof must be satisfactory to us" was sufficient to convey discretionary authority); *Miller v. Wang Laboratories, Inc.*, 998 F. Supp. 78, 80 (D. Mass. 1998) (recognizing that language requiring proof of claim to be "satisfactory to us" conferred necessary discretion); *Guarino v. Metropolitan Life Ins., Co.*, 915 F. Supp. 435, 444 (D. Mass. 1995) (language requiring that "all proof of claim must be satisfactory to the Insurance Company" granted discretionary authority).

Accordingly, the Court will uphold Sun Life's decision to deny plaintiff benefits unless it was arbitrary, capricious, or an abuse of discretion.

**B.    Sun Life's Decision to Deny Plaintiff Benefits**

Plaintiff contends that Sun Life's decision that he was not entitled to benefits after March 31, 2002, was arbitrary and capricious because (1) it did not give proper weight to plaintiff's physical ailments in reaching its decision to deny benefits and (2) it inappropriately categorized ADD as a "mental" rather than "physical" illness.  The Court will address each of these arguments in turn.

**1.    The Decision That Plaintiff's Physical Problems Did Not Render Him "Totally Disabled"**

Plaintiff first contends that Sun Life's decision to deny him long-term disability benefits after 24 months was arbitrary and capricious, given the "myriad of medical evidence" demonstrating that he suffers from sleep apnea, periodic limb movements of sleep, a "serious cardiac situation," polymyalgia/rheumatica, and carpal tunnel syndrome.  That argument, however, misses the mark.  The issue is not whether he suffers from these physical conditions;

Sun Life essentially concedes that he does.[6]  Instead, it is whether, under the terms of the policy, plaintiff's physical condition renders him "unable to perform all of the material and substantial duties of his own occupation."  *See Boardman v. Prudential Ins. Co. of America*, 337 F.3d 9, 16-17 (1st Cir. 2003) (upholding denial decision when insurer recognized claimant's physical illness but found no evidence of any limitations or restrictions that would preclude her from working).  Sun Life's decision that plaintiff's physical problems did not render him "totally disabled" should be upheld "if it is reasoned and supported by substantial evidence in the record."  *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir. 2001) (internal quotations omitted).

          a.         **The Evidence Sun Life Relied Upon in Making its Determination**

In making its initial denial decision, Sun Life had plaintiff's records reviewed by a nurse,  a board-certified internist, and a board-certified psychiatrist.  Sun Life also sent plaintiff for an independent medical examination by a neuropsychologist.  Collectively, the reviews and examination results suggested that plaintiff's periodic limb movements were not vocationally incapacitating; that his sleep apnea was well-controlled with medications; and that he was suffering from anxiety disorder with panic attacks, major depression, and alcohol abuse (which was in remission).

In addition, Sun Life subsequently reviewed the statements of plaintiff's attending physicians.  Sun Life concluded that the reports were consistent with vocationally incapacitating

---

[6] Sun Life contends that plaintiff did not provide it with medical records from a cardiologist or any other medical provider relating to treatment for cardiac issues after December 1998, and that the available records did not indicate that plaintiff was limited in any way from performing his work duties by any cardiac condition.

mental, rather than physical, illness, based, in part, on the following information provided by plaintiff's physicians:

(1)  In July 2000, Dr. Grimaldi and Dr. Och indicated that plaintiff had a Class 2 physical impairment (medium manual activity) and a Class 5 mental impairment (loss of psychological, physiological, personal and social adjustments–severe limitations).

(2)  In August 2000, Dr. Phadke wrote "n/a" next to the "Physical Impairment" box on an APS and indicated that plaintiff was suffering from depression.  Four months later, in December 2000, Dr. Phadke noted that plaintiff's sleep apnea was "doing well" and that his "restless leg syndrome and periodic leg movements appear to have responded quite strikingly" to medication at bedtime.

(3)  In November 2000, Dr. Kent performed a neuropsychological evaluation of plaintiff and found that his test results were not consistent with a diagnosis of ADHD.  Dr. Kent also found that from 1998 to 2000 there was no significant change in cognitive capacities, but that there had been "a significant exacerbation of emotional symptoms."

(4)  In June 2001 and January 2002, Dr. Grimaldi indicated that plaintiff's diagnoses were depressive disorder, ADD, and a history of sleep apnea.  Dr. Grimaldi did not indicate any objective findings and left the cardiac and physical impairment sections on the APS form blank. He also did not list any physical restrictions or limitations.

(5) In May 2002, Dr. Calkins indicated that following plaintiff's right carpal tunnel release, he was doing well.

(6)  In October 2002, Dr. Pyun observed that plaintiff reported that he "feels great. . . every symptom has gone away including the morning stiffness, pain, lack of movement. . . . He is

sleeping well."

(7) In October 2002, Dr. Trotter indicated that plaintiff's diagnoses were right carpal tunnel syndrome and polymyalgia rheumatica; that both problems had been treated; that plaintiff was capable of sedentary activity and had moderate mental limitations; and that his physical symptoms should be abating already.

(8) In November 2002, Dr. Trotter wrote a note indicating that plaintiff reported "feeling very well now," and opining that from a work standpoint, "the only thing keeping him out of work now is mental health issues."

(9) In November 2002, Dr. Och diagnosed plaintiff as having depression and ADHD; noted no objective findings, subjective symptoms, or physical limitations; and indicated that plaintiff was prevented from returning to work because of "chronic psychiatric symptoms."

Once Sun Life received plaintiff's appeal materials, it again subjected the entire file to reviews by a board-certified specialist in physical medicine and rehabilitation, Dr. James Sarni, and a board-certified psychiatrist, Dr. Himber. Dr. Sarni opined that plaintiff had a light duty occupation and that it was reasonable to restrict him to a sedentary, light duty occupation. Dr. Himber found that there was no objective data supporting an incapacitating psychiatric disorder and that there was no support for a diagnosis of ADD.

### b.    Whether the Decision Was Arbitrary and Capricious

The administrative record makes it abundantly clear that Sun Life's decision that plaintiff's physical problems were not totally disabling was not arbitrary and capricious. To the contrary, the decision was supported by substantial evidence, including the reports of plaintiff's treating physicians, a multitude of reviewing physicians, and an independent medical examination. *Vlass*,

244 F.3d at 30. All of those physicians agreed that his sleep problems, polymyalgia, and carpal tunnel syndrome did not limit him from performing the material and substantial duties of his own occupation.

Plaintiff further contends that he has cardiac problems, but he did not provide Sun Life with any medical records relating to treatment for cardiac issues after December 1998. And while the records that plaintiff did provide showed that he had complained of chest pains, there is no evidence that this limited plaintiff in any way from performing his job duties. Furthermore, during the time frame that Sun Life was evaluating plaintiff's claim, his own physicians did not indicate that he was disabled due to a cardiac condition.

Plaintiff also criticizes the fact that Sun Life did not request an examination by an independent neurologist or sleep-disorder specialist.[7] However, Sun Life was under no such obligation, as "[d]enials of benefits may be based on review of medical records submitted by the claimant." *Orndorf*, 404 F.3d at 526 (rejecting plaintiff's claim that insurer was required to have its own physician examine him as opposed to reviewing his records). Furthermore, many of the medical records and reports that plaintiff submitted came directly from neurology and sleep-disorder specialists. Notably, these records did not support plaintiff's position that his physical problems prevented him from performing his job. For example, Dr. Phadke, Chief of Neurology and Director of the Sleep Disorder Center at St. Vincent Hospital, reported on April 23, 1999, that plaintiff's "cognitive symptoms in the daytime and the excessive fatigue and reduced mental

---

[7] The Court notes that Sun Life did have plaintiff independently examined by a neuropyschologist. Plaintiff fails to explain why a neurologist, as opposed to a neuropyschologist, should have conducted the examination.

energy are much more likely to be principally related to depression" than to sleep disorders.[8]

Under the arbitrary and capricious standard, the Court asks only "whether the fact finder's decision is plausible in light of the record as a whole." *Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002). Given the abundance of evidence suggesting that plaintiff's physical conditions did not prevent him from performing his occupation, Sun Life's decision to deny him long-term disability benefits was neither arbitrary nor capricious.

### 2.     The Decision to Characterize ADD as a "Mental Illness"

Plaintiff also contends that Sun Life's characterization of his ADD as "mental" rather than "physical" was arbitrary and capricious. The plan defines "mental illness" as "mental, nervous, psychological, emotional disease, or behavioral disorders of any type." Plaintiff asserts that the "strong genetic, neurochemical and biologically driven bases of many mental illnesses" is "indisputable" and that his ADD is therefore the result of physical, not mental, illness.

As a preliminary matter, the physicians who saw plaintiff and reviewed his medical records did not all agree that he suffers from ADD.[9] Even assuming—as Sun Life did—that plaintiff has ADD, it appears that only one physician opined that the disorder resulted in physical, rather than mental, impairment: plaintiff's psychologist, Dr. Grimaldi.[10] In Dr. Grimaldi's January 2003

---

[8] Plaintiff also contends that Sun Life should have had a neurologist or sleep-disorder specialist review his medical records, as opposed to a psychiatrist and internist. Again, plaintiff has not provided any evidence that Sun Life had an obligation to consult neurologists and sleep-disorder specialists. Furthermore, Sun Life did not rely exclusively on the opinions of Dr. Pies and Dr. Tsai. It also had plaintiff undergo an independent neuropsychological examination and asked a specialist in physical medicine and rehabilitation, Dr. Sarni, and an additional psychiatrist, Dr. Himber, to review his file.

[9] While Dr. Grimaldi diagnosed ADD (and Dr. Och diagnosed ADHD), Dr. Kent, Dr. Gansler, and Dr. Himber did not find support for the diagnosis after testing plaintiff and/or reviewing his medical records.

[10] According to Dr. Himber's review of the medical file, the non-psychiatric physicians who treated plaintiff did not document symptoms of ADD.

letter, he asserts that plaintiff's vocational incapacity is due to ADD and that the disorder is

"definitely the result of neurological dysfunction not psychological or environmental factors."

However, other physicians who saw plaintiff or reviewed his medical records clearly disagreed

both with Dr. Grimaldi's opinion that ADD caused plaintiff's vocational incapacity and his

categorization of the disorder as physical, rather than mental.  For example, Dr. Himber, a

psychiatrist labeled Dr. Grimaldi's categorization of ADD as "puzzling."[11]  Dr. Och, a psychiatrist

who diagnosed plaintiff with ADHD, appeared to consider it to be a mental disorder as well.  In

November 2002, she left the section on physical impairments blank, but indicated that plaintiff had

a "Class 5" mental impairment.

　　　　Sun Life was not required to credit the opinion of plaintiff's treating psychologist, or to

give it "special weight."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

Instead, when faced with conflicting opinions, Sun Life was permitted to weigh and assess the

conflicting evidence.  *See Vlass*, 244 F.3d at 32 (holding that insurer's decision to adopt the

opinion of one doctor about claimant's ability to function over another's was not arbitrary and

capricious).  Furthermore, Sun Life did not have a "discrete burden of explanation" because it

credited "reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker*,

538 U.S. at 834.  The fact that Sun Life adopted the opinions of medical consultants and

physicians other than Dr. Grimaldi does not mean that its decision was arbitrary and capricious.

---

[11] Dr. Himber pointed out that Dr. Grimaldi quoted from the Diagnostic and Statistical Manual IV (DSM-IV) of the American Psychiatric Association.  The DSM-IV is a psychiatric, not neurological, compendium, suggesting at least preliminarily, that Sun Life's categorization of ADD as a mental illness was reasonable.  *See Hess v. Allstate Ins. Co.*, 2000 WL 1186262 at * 12 (D. Me. 2000) (finding it reasonable for insurer to rely, at least in part, on the classification of claimant's disease as a psychiatric disorder in the DSM-IV as basis for concluding disease was "mental illness").

*Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211, 214 (1st Cir. 2004) (a non-examining physician's review of a claimant's file is reliable medical evidence); *Lopes v. Metropolitan Life Ins. Co.*, 332 F.3d 6 (1st Cir. 2003) (reliance on medical consultants' opinions justified although contradictory to treating physician).

Sun Life's conclusion that plaintiff's ADD is a mental illness is reasonable in other respects, as well. Under the policy, beneficiaries who are disabled as a result of mental illness are eligible to receive benefits for a shorter length of time than beneficiaries who become disabled because of other types of illnesses. The policy restriction "would be rendered meaningless" if, as plaintiff suggests, the term "mental illness" were to be read so narrowly as to exclude every mental disorder that is deemed to have a physical component. *See Pelletier v. Fleet Fin. Group, Inc.*, 2000 WL 1513711 (D. N.H. 2000) (rejecting argument that the term "mental illness" should be read to exclude every mental disorder with an organic cause). This is especially true if as plaintiff contends, many mental diseases have physical components.

In short, Sun Life's decision to deny Thiffault's application for long-term disability benefits was based upon substantial medical evidence and was reasonably consistent with the terms of the plan. Accordingly, that decision was not arbitrary and capricious. Defendant's motion for summary judgment will be granted, and plaintiff's cross-motion will be denied.

**IV.    Conclusion**

For the foregoing reasons, Defendant Sun Life's Motion for Summary Judgment is GRANTED. Plaintiff's Motion for Summary Judgment is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor

F. Dennis Saylor IV
Dated: January 24, 2007                          United States District Judge